## ALEXANDER *v.* BLACKMAN.

PATENTS; INTERFERENCE; WEIGHT OF EVIDENCE; PRESUMPTIONS.

In weighing testimony, the court is not bound to believe a particular fact testified to by one or more witnesses, simply because they may not have been directly contradicted therein, or impeached generally by evidence tending to show a want of reputation for veracity. The inherent probability or improbability of such a fact is to be tested by the unquestioned circumstances that surround the main transaction

or occurrence, as well as by the ordinary laws that govern human con-
duct. (Following *Beals* v. *Finkenbiner,* 12 App. D. C. 23, 29.)

2. Where each of two parties to an interference claims a disclosure to the
other, the presumption is in favor of the one who has a practical
knowledge of the art, and against the one who has not such knowledge.

3. Where a party testifies to a certain conversation in great detail, and an-
other witness, a clerk in a store, testifies to precisely the same words,
and it appears that at the time the conversation took place the second
witness was engaged in waiting on a customer, the testimony of the
first witness is weakened, rather than corroborated, by the remarkable
likeness in the two versions.

4. The failure to call a witness who can testify to material facts in a case
creates a presumption that his testimony would be unfavorable. (Fol-
lowing *Ruete* v. *Elwell,* 15 App. D. C. 21; *Flora* v. *Powrie,* 23 App.
D. C. 195; *Gallagher* v. *Hastings,* 21 App. D. C. 88.)

5. Where a witness testifies falsely as to a fact in respect to which he can-
not be presumed liable to mistake, courts are bound, upon the princi-
ples of law, morality, and justice, to apply the maxim, *Falsus in uno,
falsus in omnibus.*

6. Even where a witness has sworn positively to an alleged fact, the tri-
bunal called upon to pass upon the testimony of such witness may, for
good and sufficient reasons, refuse to credit it. (Following *Green-
wood* v. *Dover,* 23 App. D. C. 251.)

No. 259. Patent Appeals. Submitted November 10, 1905. Decided Janu-
ary 12, 1906.

REHEARING on an appeal from a decision of the Commissioner
of Patents in an interference case. *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. G. D. Seymour, Mr. H. A. Seymour, Mr. W. Klingen-
stein,* and *Mr. George W. Robinson* for the appellant.

*Mr. Chester A. Weed, Mr. Frank W. Etheridge,* and *Mr.
Francis H. Richards* for the appellee.

Mr. Justice DUELL delivered the opinion of the Court:

A petition for rehearing was filed herein and a rehearing
granted by a majority of the court, sitting at the original hear-

ing of the case.   Such rehearing was heard by the court, as now constituted, and we have, after a careful examination and consideration of the too voluminous record, come to the conclusion that the former decision awarding priority to Alexander, and reversing the Commissioner of Patents, should be set aside for the reasons, among others, hereinafter set forth.*

There are no new or difficult questions of law to be determined, for the question to be passed upon is that of originality of invention, and not one of priority of invention.  Its solution depends upon the facts disclosed by the record, and it turns upon the credibiity of the witnesses and the weight to be given to their testimony, and especially to Alexander and to his testimony. It will be unnecessary to restate the issue, for there is no dispute as to its meaning, its patentability, or to the right of the true inventor to make  it.   It is only necessary to say that the invention relates to the art of carpentry, and is for a wood flooring made up of blocks composed of two sections interlocked by sliding one upon the other.

The Examiner of Interferences and the Commissioner of Patents found for Blackman; the Examiners-in-Chief for Alexander.

Each party claims to have disclosed the invention to the other at Alexander's clothing store in Meriden, Connecticut, on September 24, 1900.

Blackman makes no claim to have had even a conception of the invention before that day.   Alexander, on the contrary, asserts a conception of the invention on September 12th; disclosure to others on the 15th; that a drawing was made on the 16th; that he made a block on the 16th and 17th; and that wood blocks were made by Currier on the 17th,—all these dates being prior to his conversation with Blackman.   Blackman's case is a simple one, and is clearly set forth; conception and disclosure on the 24th of September; further disclosures to others a few days thereafter; and a reduction to practice October 27, 1900.   His application was filed January 14, 1901.   Provided he disclosed the

---

*The former opinion was withdrawn by the Court, and has, therefore, never been reported.—Reporter.

invention to Alexander as claimed, and that Alexander up to that time had not disclosed the invention to anyone, he is clearly entitled to a favorable judgment. It becomes necessary, therefore, to examine the case presented by Alexander, and to determine whether or not he was in possession of the invention prior to September 24, 1900, and on that day disclosed it to Blackman. In doing this we shall follow the rule laid down by this court in *Beals* v. *Finkenbiner,* 12 App. D. C. 23, 29 : "In weighing testimony we are not bound to believe a particular fact, testified to by one or more witnesses, simply because they may not have been directly contradicted therein, or impeached generally by evidence tending to show a want of reputation for veracity. The inherent probability or improbability of such a fact is to be tested by the unquestioned circumstances that surround the main transaction or occurrence, as well as 'by the ordinary laws that govern human conduct.' *Atlantic Works* v. *Brady,* 107 U. S. 192, 203, 27 L. ed. 438, 442, 2 Sup. Ct. Rep. 225; *Telephone Cases,* 126 U. S. 567, 31 L. ed. 1000, 8 Sup. Ct. Rep. 778."

The "main occurrence" in the present case is that of the alleged disclosure of the invention by one to the other. That the conversation relative to the invention took place at the stated time and place is admitted by both.

The invention was in the woodworking art. Blackman was a carpenter, Alexander a clothier, and, as he says, knew very little about carpentry. Blackman says he had difficulty in making Alexander understand what he meant by a "dovetail joint," and it was quite natural that Alexander should have asked what it was. Even when testifying in this proceeding, his practical knowledge of a dovetail does not seem to have greatly increased, as his definition that it means "a joint that spreads like a dove's tail" is not one that a man having practical knowledge would give. The strong probability is that a man having practical knowledge of an art to which an invention belongs is the one who makes the disclosure to the one unskilled in that art. The one asserting the contrary has to overcome the burden. We think that Alexander has failed to overcome the presumption existing against him. Trüe, Alexander says he

had lost some money in backing his son-in-law in what he terms the "Mansfield block flooring," but there was nothing in that which would have suggested to a layman the invention in dispute. But to a carpenter it would be the most natural thing in the world to cure the defects in a floor block composed of parts glued together, by providing the parts of the block with interlocking devices.

A careful consideration of all the facts and circumstances connected with the meeting of the two men, of their previous training and occupations, leads to but one conclusion and that is that Blackman was the one who naturally would have made the invention and disclosed it to Alexander. This presumption is strengthened by the fact that then and there it was arranged that Blackman should make fourteen or sixteen of the blocks, and that when made Alexander should test them. Alexander did not give Blackman the block he claims to have made a week or so previous for a guide, nor the two blocks that he claims he had had made on September 17 by Currier. It would seem that if he had three blocks already in hand, two made by a practical cabinetmaker, he would have said something to Blackman about them and given him one of them as a guide. His silence is suggestive. Alexander offers a corroborating witness in the person of one Hagner, a clerk in his employ. Hagner testifies that he was waiting on a customer and while doing so he overheard part of the conversation between the two men. Nothing to our minds proves more clearly the untruthfulness of Alexander's version of the conversation than the almost word-for-word correspondence between the evidence of the two men on this subject. Hagner was waiting upon a customer at the time, and his attention must have been directed mainly to her. He says that during the conversation he went to the bundle counter to do up the packing of clothing the customer had purchased, and on his return heard more of the conversation. It is a curious fact that he takes up the conversation as testified to by Alexander so there is no break in it. Compare the testimony of these men:

Alexander says: " 'Blackman, haven't you told me that you were a carpenter at one time?' He replied 'I worked at it thirty·

five years ago.' * * * 'I want to get your opinion on it.'
I explained the block to him, and I asked him whether he
thought that, through contraction and expansion of the wood,
whether that top would split or the dovetails would break off; on
that he replied 'I don't think so, but I'll find out for you.' I
then asked him how he could find out. He said, 'I have a niece
here in Meriden; she is married to a woodworker that works in
the big shop,' which means the Britannia shop, Meriden; his
name is Kelsey,—that he could find out from him. I wasn't
satisfied with that so I told him that I would like to have it test-
ed in my own house. I then said: 'Blackman, you could do me
a favor. You are living so near Hartford, the next time that
you go into Hartford I wish you would go into one of those large
mills and see if they have a dovetailing machine that can make
this block, as the only way I can get them made here is by hand,
and that is too expensive. If you can get them made there,
order sixteen blocks as that would just make a square.' He
said: 'I will do so if you want me to; but the man I am stop-
ping with is a carpenter and we can get them out for you by
hand, and it will not cost you much more, if any more, as if you
had them made by a machine.' On that * * * then he
asked me for some clothes, he said that he was of about the same
size as I am, and wears about the same size clothes, if I had
any that I won't wear any more I should let him have it, as the
ones he had on were the only ones he had, and they were looking
shabby. I said I had, and I walked to a still further part in the
store and got a suit of clothes of mine from there and a pair of
shoes of mine, and I gave it to the young man that was standing
there arranging the stock to put them up for Mr. Blackman. At
the time Blackman remarked to him: 'Do them up strong as I
can't take them with me where I am going; I shall send them
home by express.' He then remarked that the winter is coming
on and he did not have an overcoat, and if I had one that I
wouldn't wear any more this winter to think of him. I told
him he needn't bother about it; I would see that he gets one,—
something to that effect. He then thanked me, and said: 'Any
time that I can be of any assistance to you on that flooring I will
be only too glad to do so.' "

Hagner says: "I heard Mr. Alexander ask Blackman if he wasn't a carpenter at one time. Mr. Blackman said: 'I worked at it some thirty-five years ago.' Mr. Alexander said: 'I've got something here I'd like to get your opinion on,' and he went on explaining the idea of the block. Mr. Alexander asked Mr. Blackman if he thought the dovetails would break off, or the top would split in any way. Mr. Blackman said: 'I don't know, but I'll find out for you.' Mr. Alexander asked him, how could he find out. Mr. Blackman said: 'A niece of mine is married to a man that works in the big shop, and he's a woodworker; he could tell me.' Mr. Alexander said: 'I'd like to test them blocks myself, but the only way that I can have them made here is by hand, and that would cost too much. As you are living so near to Hartford, I wish you would do me the favor and go into some of the mills up there where they would have such machines to do that kind of work; if so, I wish you would order me sixteen blocks, that would just make a square when laid;' Blackman said: 'I'll do so if you want me to, but the man I am stopping with is a carpenter and between the both of us we can make them nights for you, and it wouldn't cost you much more, if any more.' "

At this point Hagner says he went out and on his return he continued: "After I came back I heard Mr. Blackman say something about 'old clothes;' he said: 'Mr. Alexander, if you have got any clothes which you wouldn't wear any more I wish you would let me have them, because this is about all I've got;' Mr. Alexander went over to a closet. He got out an old suit of his and a pair of shoes and gave them to me to do up. As I was doing them up Mr. Blackman remarked to me: 'Do them up good and strong;' as he wanted to send them home by Adams Express because he wasn't going home from here. He also said something about an overcoat; if Mr. Alexander had an old overcoat that he wouldn't use any more to 'think of him.' Mr. Alexander said: 'I won't forget you.' As Mr. Blackman was leaving the department, he says to Mr. Alexander: 'If I can be of any assistance to you at any time on the subject of parquet flooring I will gladly do so for what you have done for me.' "

It appears, therefore, that Hagner, Alexander's clerk, remembers a conversation he chanced to overhear while waiting upon a customer, and repeats it twenty months after it occurred in almost the very words used by Alexander in giving his version of the conversation. It does not ring true. It bears the earmarks of a manufactured story. Alexander's testimony as to the conversation would have more weight were it not for the attempted corroboration.

The record further discloses that Alexander not only gave Blackman some of his cast-off clothes that day, but in the following October he went to New Britain to see Blackman, and gave him a new overcoat and a slightly worn hat. When he wished to learn anything about wood floorings he seems to have turned to Blackman, and, Greek-like, bore gifts. Later on, when the interference was declared, he offered Blackman various sums to withdraw his application. Ordinarily an effort to end a litigation by compromise is to be commended, but when in an interference the question at issue is one of originality, and not of priority, such offers as Alexander made are open to suspicion, for Alexander's honor was involved in the proceeding, and, if his story be true, he had a perfect case.

Again it seems quite improbable that Blackman would have given September 24 as his earliest date if Alexander had explained to him the invention on that very day by means of his so-called "sketch block." If Alexander could prove that he was in the possession of the invention before the 24th of September (as he undoubtedly was if he then explained the invention to Blackman by means of the sketch block) Blackman would have been beaten at the outset, as Blackman would well know.

We cannot believe that Alexander disclosed the invention to Blackman. If, however, we find that he had disclosed the invention to others before Blackman and he met on September 24, 1900, then we must admit that, notwithstanding the inherent improbability of his story, he is the true inventor.

We have carefully considered the testimony of Alexander and his witnesses as to his alleged prior possession of the invention. Unless we can credit Alexander's testimony, we cannot credit that

of his witnesses.   His testimony is the corner stone of the arch, and, if it falls, the testimony of the others falls with it.   We do not mean to say that his uncorroborated testimony as to prior possession of the invention would be sufficient. Rather, if his story is untrue the testimony of the others amounts to nothing, and they have either testified falsely, or have been persuaded into believing that the dates he gives are the correct ones, when, as a matter of fact, they are mistaken as to dates, and have been led into very grave errors, to put it mildly.   As Circuit Judge Wallace aptly put it in an analogous case, (*American Bell Teleph. Co.* v. *People's Teleph. Co.* 22 Blatchf. 531, 22 Fed. 309): "Thus Drawbaugh is corroborated by a cloud of witnesses whose testimony tends to substantiate his narrative. * * * In order to ascertain what effect is to be given to the corroborative proofs, it is important to determine whether Drawbaugh is an honest witness, or whether he has intentionally falsified collateral facts, and is therefore to be deemed discredited."

Alexander says that he conceived the invention on September 12, 1900; that he went to the store of one Rudolph, where he ordered some groceries, and selected a box as his daughter wished to send a jar of preserves to a friend; that he took the box with him, and, noticing its matched corners, it occurred to him that if dovetails could be arranged flatwise an interlocking block could be made that would hold without glue; that, after thinking considerably about it, he took a sample block of the old glued flooring that was lying on his desk and inked dovetails on it and put the date "Sep. 12" on it in two places; that he did nothing further until the 15th, when he showed it to his son-in-law Mansfield; that one of his salesmen, Hagner, came up at that time and picked up the block and noticed the date on it; that the same evening he disclosed the invention to Harris and Ahern; that from the former he borrowed some tools to use at his home in making a block; that on the 16th he started to make the block and on the 17th he finished it; that his son-in-law Mansfield, and his own wife and daughter, saw him making the block; that on the 16th Mansfield, who is a draftsman, made a drawing of the

device; that on the 17th, the day he finished the block, he gave an order to one Currier, a carpenter in Meriden, to make two blocks, which were delivered to him about half-past six that evening; that he thinks he showed the blocks the same evening to Mansfield; and that the next day he showed the block he had himself made to one Hull.

There is much to cast doubt upon this story. Alexander was a merchant, and it appears that he had boxes of all sizes in his store, and boxes with matched corners. Is it probable that, having boxes in his own store, he would, on his way to his own store, order a box from another merchant? Is it probable that the box suggested to him the invention, when other boxes with matched corners had not led him to the invention,—especially when it is shown that he had tables in his store, with drawers having "dovetail" corners, of which he was very proud, which had not helped him? His denial that he had such boxes, and his mutilated ledger which it is claimed would have shown that he had not testified truthfully on this point, bear very heavily against the truth of his story. His "sketch block" could have been made as well after his interview with Blackman as on September 12,—and better, because we doubt whether he had enough knowledge of "dovetails" on the earlier date to make a sketch of the device. His alleged disclosures, made on September 15, were made to parties whom ordinarily an inventor, as Alexander claims he was, would not have taken into his confidence. This leaves out of consideration Mansfield, his son-in-law. And here it may well be said that the failure to call Mansfield, or to give any reason for not calling him, puts Alexander's case in very bad light. Mansfield had gotten Alexander involved in a wood-flooring scheme, which Alexander says was known as the "Mansfield." He was versed in and interested in the subject. Alexander showed him the "sketch block;" Alexander says that Mansfield had seen him making the block on September 16; had made a drawing of the invention for him on that date; had made the entry in the books by which Hagner had fixed the date of the disclosure to him. Mansfield could have cleared up many of the weak points in Alexander's case. He was not called.

What is the logical conclusion from the failure to call such a witness, or to excuse his absence? The inference is not only unfavorable, but the presumption is that the testimony would be unfavorable. *Graves* v. *United States,* 150 U. S. 118, 37 L. ed. 1021, 14 Sup. Ct. Rep. 40; *Ruete* v. *Elwell,* 15 App. D. C. 21; *Flora* v. *Powrie,* 23 App. D. C. 195; *Gallagher* v. *Hastings,* 21 App. D. C. 88. His wife and daughter, he says, also saw him make the block. Neither is called. Had he sufficient evidence without them, his omission to call them might have been excused; but, under the circumstances of the case, it bears against him. Alexander claims to have completed his block on September 17. On that same day he says he ordered two blocks made by one Currier, and that he received them about half after six that evening. It is to be noted that he had difficulty in making Currier understand what he wanted, and that finally he made a little sketch for him. Currier was a woodworker,—a cabinetmaker,—and as such he must necessarily have been familiar with "dovetails." The fact that Currier failed to understand Alexander argues rather that Alexander did not know enough to explain what he wanted. At the time he says he went to Currier he had a drawing, a sketch block, and a regular block, all embodying his invention, and yet he did not take a single one of these with him. Comment seems unnecessary.

Alexander's story is plausible, but there is enough in it to cast the gravest doubt upon it. It is a story that could easily be manufactured, and we cannot escape the conviction that it is not a truthful statement of facts.

The seeming inherent improbabilities of Alexander's testimony may be overcome by the proofs offered in corroboration, or it may be made to appear more plainly that the story is a made-up one. We cannot set forth at length this corroborating testimony. In the main we agree with the Commissioner of Patents, who has fully reviewed it, and with the conclusions drawn therefrom. We think it does not strengthen Alexander's case. Rudolph, the grocer, who attempts to fix the date of Alexander's getting a box from him by a sales slip, knows noth-

ing about the style of box, nor is there anything on the sales slip which shows it.    The place on the slip where the word "box" is written is not where it would appear if the story is true.    We cannot go into details, but the sales slip and Rudolph's testimony are worthless as an aid to Alexander.

Ahern's testimony is not entitled to any credit, certainly not as fixing any correct date of disclosure to him.    Hagner, Alexander's clerk, is also not entitled to credit.    He could not have seen Ahern in Alexander's store on September 15, for there is no evidence that Ahern was there on that date.    His testimony on that point is overcome by that of Gardner and Mrs. Lawton. The improbability of Harris's statement that he made a memorandum of the tools that Alexander wished to borrow from him on a sales slip, which, according to the custom of that store (and in fact of nearly all other stores), was done up with the goods purchased, and his statement that he saw Alexander showing Ahern the "sketch block" on the evening of September 15, when Ahern is not shown to have been in the store, are sufficient to rob his testimony of any weight.    The Examiner of Interferences has carefully and fully reviewed Hull's testimony, and shown that it is not entitled to any credit.    We can apply to Hagner, Ahern and Harris the rule that where a witness falsifies a fact in respect of which he cannot be presumed liable to mistake, courts are bound, "upon the principles of law, morality, and justice, to apply the maxim, *Falsus in uno, falsus in omnibus.*" *The Santissima Trinidad,* 7 Wheat. 283, 5 L. ed. 454.    In fact the particularity of testimony of the various corroborating witnesses is such as to cast doubt upon their testimony, for none of the witnesses are men of trained minds, who could hold in memory for a period of a year and a half the petty details in reference to which they testify so positively.

This leaves for consideration the testimony of Ryan and Currier to be considered.    It was their testimony, in connection with the book entries referred to by them, that was deemed sufficient by the court at the former hearing to prove that Alexander was in possession of the invention, and had had two blocks made prior to September 24, 1900.

Let us review the proofs relating to and the circumstances surrounding the making of the two blocks by Currier. We must, in view of what we have said, disregard Alexander's testimony, for we believe that he is not entitled to any credit.

Two witnesses are called to prove the making of the blocks by Currier. The important question is, *when* they were made. James W. Ryan, a bookkeeper in the employ of Herman E. Hubbard until November 20, 1900, testifies that Alexander came to Hubbard's shop to have some work done, and he, Ryan, directed him to Dewey and Currier, who conducted the cabinet department of Hubbard's shop. Ryan, in addition to his other duties, kept Dewey and Currier's books. He went to Currier for the charge made against Alexander so that he could make out a bill. He thinks Currier opened a book and called off the items to him, and that he put them on the back of an envelope which he did not preserve. He entered the charges in the journal kept by Hubbard. The journal is produced and contains an entry of a charge against Alexander under date of September 17, 1900. Ryan cannot tell when he made the entry in the journal. He did not see the items that Currier read him from his book. He knows nothing about the date, and, so far as Hubbard's journal and ledger are concerned, they are of no value in proving when Alexander came to the shop, or when the work was done. They are not books of original entry. The charges against Alexander were copied from memoranda on the back of an envelope, and when so copied were items read off by Currier to Ryan. Ryan's testimony only shows that some time Alexander came to Hubbard's shop and had some work done. It appears further that Ryan changed the kind of pen he was writing with up to October 1, 1900, and that the Alexander entry was made after the change of pens, which leads Ryan to express the opinion that the entry was made not earlier than October 1, 1900, and might have been as late as the 6th or 7th. He is also of the opinion that, as the entry was not made earlier than October 1, he could not have received it many days before. The bill against Alexander is made out under date of October 20, 1900. It was the custom to send out bills on the first of

each month.   He also admits that he might have written down
17 for 27.   It is plain that Ryan wrote down what Currier told
him, and even at that he may have made a mistake.   His testi-
mony is of no value as proving the time when the blocks were
made.   Such proof rests, therefore, upon Currier's testimony,
and upon his memorandum books.   Currier produced his note
book from which the charges against Alexander were taken.
The petition for the rehearing was largely based upon allegations
of changes made in this book, the discrepancies in the book, and
the consequent unreliability of Currier's testimony,—all these,
of course, taken in connection with the testimony of Alexander
and his other witnesses.   An examination of the book, and the
entries therein contained, and the order in which they appear,
lead us to the conclusion that it is entitled to little probative
force.   It is apparent that the entries in this book were not
made in the order in which the work they related to was done.
The second and later entries on given pages often bear an earlier
date than the first entry.   This occurs so often that it is impos-
sible to find that the entries were made in the regular course of
business.   They rather show that they were made at such times
as suited the whim, convenience, or memory of Currier.   They
were entered in pencil, and could, of course, be easily altered if
desired.   It is charged that the entry of September 17 has been
changed from September 29 to September 17.   That the date
has been changed is, we think, apparent.   We are convinced
that an erasure was made.   The figures "17" are much heavier
and darker than the balance of the Alexander entry.   Using a
magnifying-glass the figure "9" appears quite plainly.   While
we are not prepared to say that the figure preceding is a "2,"
we are clearly of the opinion that it is apparent that erasures
and changes have been made in the entry, which discredit it,
and that the entry does not prove that the date when Currier
made the blocks is correctly and truthfully given as September
17.   Standing by itself, we cannot give credit to this book.
There is one fact that throws some light on the subject.   Alex-
ander, under date of September 29, telegraphed Blackman not
to make the blocks.   Why was this telegram sent?   Alexander

says because he saw a bar in a café made by Ahern & Company, and he thought that it would be better to have the blocks made by machine. He did not know when he sent the telegram that Ahern & Company had a dovetailing-machine. It is more likely that he sent it because Currier had made, or was making, some blocks. It is impossible at this time to set forth all the circumstances that cast discredit on Currier's testimony and on his book. It seems that he had two books. The second one he kept at home and copied into it the entries from the book he kept at the shop or with him. It is conclusively shown that the entries in the two books differ materially in many places. The two books, taken together, evidence more clearly how carelessly Currier kept his books. They are insufficient to overcome the probabilities in Blackman's favor, and the many incorrect and untruthful statements of Alexander and his witnesses. True Currier testifies that the work was done on or before September 17, but in so testifying he is obliged to rely upon the entries in his book which clearly show that erasures and changes have at some time and by someone been made. Even when a witness has sworn positively to an alleged fact the tribunal called upon to pass upon the testimony of such witness may, for good and sufficient reasons, refuse to credit it. *Greenwood v. Dover,* 23 App. D. C. 251. The circumstances of this case are such that, when taken in connection with Currier's two books and his testimony relating thereto, we are unable to give credit to his testimony.

There are many other phases of the case which we have considered, but cannot, with the time at our disposal, make reference to. In the words of the Commissioner of Patents: "A very careful consideration of the voluminous records, taking into account the numerous circumstances tending to discredit Alexander's claims and support those of Blackman, leads to the conviction that Blackman is the one who originated the invention in controversy."

Believing that the former conclusion of the court was erroneous, we are compelled to find that Blackman was the true inventor of the subject-matter in controversy, and is entitled to a

favorable award. So believing, it follows that the decision of the Commissioner of Patents must be affirmed. It is accordingly so ordered. The clerk of the court will certify this opinion, and the proceedings in this court in the premises, to the Commissioner of Patents according to law. *Affirmed.*