## Bates, Appellant, *v.* Bates.

134

Argued March 9, 1943. Before KELLER, P. J., BALDRIGE, STADTFELD, RHODES, HIRT, KENWORTHEY and RENO, JJ.

reargument refused August 13, 1943.

*William T. Connor*, with him *John R. K. Scott* and *Hardie Scott*, for appellant

*John C. Noonan*, for appellee.

OPINION BY RENO, J., July 16, 1943:

The husband's libel charged desertion. The wife's answer admitted separation and alleged that his cruelty and indignities justified the separation. The master found against her and recommended a divorce. The court below overruled the master and dismissed the libel. The case is here upon libellant's appeal.

The parties were married March 11, 1939. He was forty-six years old, she twenty-nine. He had been married before, had been divorced, and, before marrying respondent, had lived with a woman in a clerically unblessed union. He is an engineer employed by a rubber manufacturing company, devoted to his profes-

sion, bringing his work home and doing it at night, and apparently without interests outside of his work and home. Essentially a quiet man, he has no inclination or aptitude for social intercourse, does not drink nor play cards, has no recreations, and to him life is a serious and sombre business. She is a native of Czechoslovakia, came to this country with her father when she was twelve years old, and had no regular occupation but occasionally worked as a salesgirl. She was, so one gathers from the testimony, full of life and abounding youth, loved social gatherings, spent considerable time with her friends and neighbors and frequently indulged an ardent appetite for strong liquors. Thus, to the disparity in age was added a decided clash of tastes and temperaments, and the marriage imperatively needed for its endurance and prosperity an abiding sense of mutual forbearance, especially since, having been acquainted for ten years before the marriage, they must have known each other's faults and frailties. This essential virtue was not practiced and the marriage was soon upon the rocks.

For two months after the marriage the parties remained at their respective homes. In May, 1939, they commenced housekeeping in the husband's cabin in a summer colony at Medford Lakes, N. J. From the very beginning of their life there, the libellant's life was, so he testified, "a hell on earth". She also testified that their quarrels began immediately after they opened the Medford Lakes home. He acknowledged that respondent performed her household work, prepared his breakfast and dinner, but they quarreled frequently about her excessive purchases of groceries, her almost nightly visits to the neighbors' cabins, her drinking habits, her intoxication, sexual and other matters. We shall briefly refer to these complaints later. As early as August, she rented an apartment in Philadelphia and threatened to leave but, so she testified, "he begged me on his knees

to stay". At another time during the summer, and the sequence of events is not clearly indicated in the record, there was a discussion between them about her leaving and libellant testified, "One evening we had a talk about wanting to leave me. She used to talk about the different people that got divorces. She thought it was wonderful, all of those things." According to him, on December 5, 1939, after he had gone to work, she left the cabin, without notice to him, moved her household goods with a moving van to an apartment in Philadelphia which she had rented at least a week before that date. Paul Sheeder drove her, with her clothing, from Medford Lakes to the apartment. They never lived together after that date. "There having been a separation for the required statutory period proved by libellant, the burden was on respondent to prove by competent evidence consent or a reasonable cause for her action": *Thomas v. Thomas,* 133 Pa. Superior Ct. 12, 14, 1 A. 2d 686. Only such cause as would itself warrant a divorce is a reasonable cause: *Rosa v. Rosa,* 95 Pa. Superior Ct. 415.

The court below concluded that "libellant, both by his conduct and positive orders that respondent leave his home, gave his consent to the separation." This rested upon the testimony of the respondent, who testified, "He told me to get out that night [immediately preceding her leaving], very late. And he also pulled things out of the bureau drawers, started to throwing them, and I told him in the morning that I was leaving, and he never answered me—just slammed the door and left." The libellant denied this. The court found corroboration of respondent in this and other episodes in the testimony of B. Paul Sheeder, who testified that he heard, from his bedroom in the cabin, the morning of her departure, libellant tell respondent "that he wished she would get the hell out, so that he could get Clare [the woman with whom libellant lived before he mar-

ried respondent] back, have somebody there that he can get what he wanted to be done."

Since respondent and the court below largely relied upon the testimony of Sheeder, his testimonial qualifications must be examined in the light presented by the record. The master reported that he was "evasive, belligerent, contradictory and badly confused." He was that and more. He was patently hostile, shifty and partisan. Even the cold type of the printed record betrays his deep emotional interest in the case. The undisputed facts indicate, at the least, a very intimate relationship between him and respondent. When respondent's father returned to his native land in 1924, he left approximately $9,000, with Sheeder to administer for the welfare of his daughter. This was invested in business enterprises in which Sheeder was interested. The record does not clearly show whether these enterprises were successful, but it is not without significance that he loaned her various sums of money, once as much as $1,500. If his own admission is properly understood, Sheeder was at one time interested in or conducted a gambling establishment. He and the respondent were engaged to be married at one time. At the height of the notorious "Daddy and Peaches" Browning case, which we know occurred in 1927, she announced their engagement in the newspapers. Apparently she did this without his knowledge and, as she explained, "more or less as a publicity stunt" to promote the theatrical aspirations which she then entertained. At that time she was seventeen years old and Sheeder was fifty-six. After her marriage with libellant, Sheeder was at the Medford Lakes home every week-end and one time remained for three whole weeks. He attended parties with her, drove her and her companions about in his car, and, as already stated, moved her and her clothing to the Philadelphia apartment when she left libellant. She testified that he arranged for the moving and paid the

**138**

rent for the first month for the Philadelphia apartment, but he denied this. Be that as it may, after the separation, he was frequently at the Philadelphia apartment, had a key to it, brought food to it every week, and took her to restaurants in Philadelphia and once went to Atlantic City with her. A witness called by libellant testified that, arriving at the Medford Lakes home one evening to visit libellant, who was not at home, he found the screen and front doors locked. His repeated "hammering" brought Sheeder to the door in his underwear, putting on a housecoat, while respondent was seen running from Sheeder's room to the bathroom completely unclothed. It may be, as respondent contends, that this testimony comes from a dubious source. Still, apart from it, there is sufficient evidence to create a very real and substantial doubt concerning his reliability as a witness. We have not been able, after an independent and prolonged study of the testimony, to conclude that judicial action can be safely predicated upon his testimony. The libellant's story, on the other hand, bears upon its face the indicia of truth; its inherent probability is convincing; it impresses us, as it undoubtedly impressed the master who saw him and could appraise his demeanor as a witness, as a truthful statement of the events which led to the separation.

Soon after the separation libellant returned to his apartment in Philadelphia. Respondent lived nearby and late in 1939, meeting her on the street, he asked her to come back to him. Her reply, according to his testimony, was, "I am sorry about everything that happened. Since we have started, we have got to go through with it." She denied that he had asked her to return to him. The court below found that the offer, if made at all, was not made in good faith because during the summer of 1940, libellant interviewed a witness for the purpose of securing information bearing upon the respondent's alleged immoral conduct. "Such maneuver-

ing by libellant," the court said, "is entirely inconsistent with his alleged offer of reconciliation." But the good faith of the offer must be judged as of the time it was made. His actions after the offer was refused could not exhibit his state of mind when he made the offer. Doubtless, by the summer of 1940, his offer having been rejected, he was preparing to institute this divorce action. In any event, "the respondent having withdrawn from the home it was not incumbent upon the libellant to seek a reconciliation nor to ask the wife to return. To the contrary it is the duty of a deserting wife to seek an appeasement and until this has been done consent to the separation is not established": *Ewing v. Ewing,* 140 Pa. Superior Ct. 448, 452, 14 A. 2d 149. Our careful independent study of this phase of the case convinces us that respondent did not prove that libellant had consented to the separation.

Turning to respondent's charges of cruelty and indignities we note that neither the master nor the court was impressed by them. The master recommended the divorce notwithstanding them; the court said, "passing the question whether libellant's conduct amounts to such indignities as would entitle respondent to a divorce, we think it clear she cannot be charged with desertion."

The charge of cruelty requires no discussion. It was ignored below and not pressed here. The charge of indignities rests upon the frequent quarrels, libellant's criticism of respondent for going out evenings and his unnatural sexual desires. So far as the numerous quarrels and the criticism are concerned, we think, with the master, that "while the parties undoubtedly had many quarrels during their brief but stormy marital career, they appear to have been mutual affairs, which were prompted for the most part by rather wide differences in tastes and temperament." In short, the period which in any marriage should be devoted to adjustment

of diverse viewpoints, whims, tastes and personalities, was consumed in mutual charges and recriminations. Without further analyzing the testimony it may be said that these episodes do not sustain a charge of indignities as defined by this court. "None of them, or all of them put together, amounted to that 'plain manifestation of settled hate and estrangement' which would render libellant's [respondent's] condition intolerable and life burdensome": *Mosher v. Mosher*, 149 Pa. Superior Ct. 422, 425, 27 A. 2d 448.

The most serious charge relates to libellant's alleged demands for unnatural sexual intercourse. These demands, respondent testified, began immediately after the marriage and, although she never acceded to them, continued to the end. She testified that they never had normal intercourse. (Curiously enough, libellant testified that part of their marital difficulties arose out of *her* desires for perverted connection.) The respondent's testimony is uncorroborated save by Sheeder who says that he heard libellant make improper sexual demands while he was in his bedroom and the Bates' were in the adjoining bedroom. He indicated to the master that there were cracks in the wall an inch and a half wide, enabling him to hear their conversation. It is simply inconceivable that a husband would make indecent proposals to his wife while her former fiance was in the next room separated only by a wall of flimsy construction. The nature of the offense, the ease with which it may be charged, the difficulty of disproving it, always require convincing corroboration by a disinterested and credible witness whose testimony bears the stamp of inherent probability. Blackstone, discussing the "infamous crime against nature," says, "[it is] a crime which ought to be strictly and impartially punished. But it is an offense of so dark a nature, so easily charged and the negative so difficult to be proved, that the accusation should be clearly made

out; for if false, it deserves a punishment inferior only to that of the crime itself": 4 Bl. Com. 215. Such testimony must be subjected to the most careful scrutiny and should be accepted only when it leads "the guarded discretion of a reasonable and just man to a conclusion of guilt": GIBSON, C. J., in *Matchin v. Matchin*, 6 Pa. 332, 338. Here we have, with Sheeder's stupidly incredible story eliminated, "oath against oath" (*Smith v. Smith*, 112 Pa. Superior Ct. 210, 212, 171 A. 125), and we cannot in that state of the testimony refuse a decree upon that infamous ground. The burden, we repeat, was upon the respondent to prove this vile charge and she utterly failed to meet the requirements of the burden of proof.

There remains for consideration the decree for separate maintenance and support which respondent secured against libellant in the Court of Chancery of New Jersey. The decree was offered in evidence but the notes of the testimony which support it were not made a part of this record. Libellant did not personally appear nor testify in his own behalf in that proceeding. While the record of such a proceeding is pertinent and admissible, it is not conclusive evidence of a desertion by the husband: *Lyons v. Lyons*, 116 Pa. Superior Ct. 385, 176 A. 792.

The decree dismissing the libel is reversed, the libel is reinstated and the record is remitted to the court below with direction to enter a decree of absolute divorce.