## KELLY v. UNITED STATES.
### No. 10639.

United States Court of Appeals
District of Columbia Circuit.

Argued April 16, 1951.

Decided Jan. 10, 1952.

James J. Laughlin, Washington, D. C., for appellant.

Emory W. Reisinger, II, Asst. U.S. Atty., Washington, D. C., with whom George Morris Fay, U. S. Atty. at the time the brief was filed, and Joseph M. Howard, Asst. U.S. Atty., Washington, D. C., were on the brief, for appellee.

Charles M. Irelan, who was appointed U.S. Atty. subsequent to the argument in this case, and Jerome Powell, Asst. U.S. Atty., Washington, D. C., also entered appearances for appellee.

Before CLARK, PRETTYMAN and PROCTOR, Circuit Judges.

PRETTYMAN, Circuit Judge.

In an information filed by the United States Attorney appellant was charged with unlawfully inviting one Frank N. Manthos to accompany him for a lewd and immoral purpose. The offense charged is by statute[1] a misdemeanor in this jurisdiction. Trial was had before a judge without a jury in the Municipal Court. Appellant was convicted and was sentenced to pay a fine of $75.00 or, in default thereof, to spend sixty days in jail. The Municipal Court of Appeals affirmed. We granted the petition for appeal, because the case presents a question of general public importance in the administration of the criminal law, upon which there has been no decision by this court.

As to some of the facts there is no dispute. Police officer Manthos, in plain clothes, was in Franklin Park on the evening in question for the purpose of making arrests such as this,—"vice duties". Franklin Park is a downtown park in Washington, a full city block square. A fellow officer, Winemiller by name, was also there "to make sure he [Manthos] was not injured". The two were seated on different benches. There were quite a few people in the Park, although it was about midnight on a Friday night. Kelly came into the Park, walked past the officers and in a few minutes came back and sat for a short time on a bench near them. Thereafter a conversation occurred between Manthos and Kelly. There is a dispute as to who started the conversation, but both men said they talked about Manthos's being a salesman of plastics (in which Kelly had done some research) and about his being from Atlanta, Georgia (where Kelly had once lived); about the weather; about the difficulty of getting a drink after hours in Washington; and about the fact that Kelly had some liquor in his apartment. The culmination of the conversation is the precise crux of the case before us, and that is in dispute. At any rate the two men walked to Kelly's car, parked on Thirteenth Street alongside the Park. Manthos placed Kelly under arrest and whistled for Winemiller, who then joined them. Winemiller had heard none of the preceding conversation. Kelly protested the arrest, denounced it as fantastic, and said he would make a test case of it and would sue the District Government and the officers in a "tort suit". Kelly is a Standard Analyst in the Public Health Service and was brought from the field service to headquarters here about three years before these events.

Concerning the beginning of the conversation Manthos said that Kelly walked up to his bench, asked what time it was, sat down, said it was a beautiful night, inquired where he was from, etc., etc. Kelly, on the other hand, said that, as he walked past Manthos, Manthos said "Hi"; that he (Kelly) stopped to see whether it was someone he knew; that Manthos said "Beautiful evening"; and that, since he (Kelly) was "feeling congenial" by reason of two or three drinks, they fell into conversation.

As to the culmination of the conversation, Manthos's version was that Kelly pro-

1. 49 Stat. 651 (1935), as amended, D.C.Code § 22–2701 (1940) (Supp. VII).

posed that they go to his (Kelly's) apartment for an act of perversion, which he described. Kelly, on the other hand, said that Manthos, after the story about selling plastics, complained about lack of friends and wanting a drink and suggested that Kelly might have liquor at his apartment; that he (Kelly) said he did have a couple of drinks in a bottle at his house and that if Manthos cared to come over he would be welcome to a drink.

Kelly testified that he had had a date with a young lady that night; that they had "about three drinks" at his apartment; and that after taking her home he decided to go to a "White Tower" (a chain of small, all-night, counter restaurants) for something to eat, parked his car, and started through the Park to the White Tower on the opposite corner. He said he missed his car keys, started back to look for them, found them in his shirt pocket, and sat down on a nearby bench in momentary relief. When he resumed his walk the episode with Manthos occurred.

Three facts apart from the main thread of events are important. First: Kelly shared his apartment with a roommate. At the time of the events we have described, the roommate was at the apartment, and Kelly knew he was there because they had met as Kelly left before the Park incident. Second: Manthos on the witness stand unequivocally denied that he had told any officer at the Probation Office that there had been complaints about Kelly at the Public Health Service. An officer in the Probation Office testified unequivocally that Manthos had come to that Office and made that statement. Third: Although Manthos said he could not recall how many similar arrests he had made in Franklin Park that night, Winemiller said that Manthos had made six such arrests that night.

Ten character witnesses, most of them fellow workers in the Public Health Service, testified in Kelly's behalf.

The offense charged consists of a few spoken words, a verbal invitation to do a perverted act. Only two persons know whether the words were spoken. The officer says they were: Kelly says they were not. The rest of the evidence is circumstantial.

The first question before us is whether a judgment of conviction for this offense can be rendered or, if rendered, can be sustained upon the testimony of one witness, unless corroborated as to the offense itself, *i.e.*, as to the utterance of the invitation. This is the question by reason of which we granted this appeal.

 It is established that we have authority to prescribe for this jurisdiction rules relating to proof in criminal cases.[2] Indeed, there is upon us the responsibility for "Matters relating to law enforcement in the District".[3] We have in the past established such rules. For example, in respect to rape, we have held that the testimony of the prosecutrix must be corroborated by evidence as to the circumstances surrounding the parties at the time;[4] we have held that if a drug addict is a prosecution witness the accused is entitled as of right to an instruction that such evidence must be viewed with suspicion and received with great caution;[5] and we have held that an accused is entitled as of right to an instruction that the testimony of an accomplice must be received with suspicion and the greatest caution.[6]

In other cases we have not prescribed rigid rules but have advised and cautioned

2. McNabb v. United States, 1943, 318 U.S. 332, 340–341, 63 S.Ct. 608, 87 L.Ed. 819; Griffin v. United States, 1949, 336 U.S. 704, 69 S.Ct. 814, 93 L.Ed. 993; Fisher v. United States, 1946, 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382; Funk v. United States, 1933, 290 U.S. 371, 54 S. Ct. 212, 78 L.Ed. 369.

3. Fisher v. United States, 1946, 328 U.S. 463, 476, 66 S.Ct. 1318, 90 L.Ed. 1382; Griffin v. United States, 1949, 336 U.S. 704, 717–718, 69 S.Ct. 814, 93 L.Ed. 993.

4. Kidwell v. United States, 1912, 38 App. D.C. 566; Ewing v. United States, 1942, 77 U.S.App.D.C. 14, 135 F.2d 633, certiorari denied, 1943, 318 U.S. 776, 63 S. Ct. 829, 87 L.Ed. 1145.

5. Fletcher v. United States, 1946, 81 U.S. App.D.C. 306, 158 F.2d 321.

6. Freed v. United States, 1920, 49 App. D.C. 392, 266 F. 1012.

the trial courts. For example, in Cratty v. United States,[7] in which the testimony of an informer was under consideration, we held, in an opinion by Chief Judge Stephens, that, even though a request for the instruction was not made and, therefore, it was not reversible error to fail to give it, "the trial court would be well advised to caution the jury as to its dependability".[8] So there is ample precedent for a ruling by this court that in certain cases the uncorroborated testimony of one witness will not support a conviction;[9] or for a peremptory requirement that an instruction that certain types of evidence must be viewed with suspicion and received with caution, must be given; or for a mere precautionary admonition to the trial courts as to the proper course in certain circumstances.

■ The case before us lies in a field in which our courts have traditionally been unusually skeptical toward the accusation. This has been true of all the so-called sex offenses. Lord Hale's epigram concerning a charge of rape was written in 1680. It is established that testimony asserting sodomy must be subjected to the most careful scrutiny.[10] Blackstone had the following to say about it: "What has been here observed, especially with regard to the manner of proof, which ought to be more clear in proportion as the crime is the more detestable, may be applied to another offence, of a still deeper malignity; the infamous crime against nature, committed either with man or beast. A crime which ought to be strictly and impartially proved, and then as strictly and impartially punished. But it is an offence of so dark a nature, so easily charged, and the negative so difficult to be proved, that the accusation should be clearly made out: for, if false, it deserves a punishment inferior only to that of the crime itself." [11]

Moreover, the courts have been realistic about the effects of a threat to accuse one of sodomy. Such a threat has been held repeatedly to be sufficiently equivalent to force and violence to constitute robbery if the threatened person parts with money because of the threat.[12] "So abominable is the crime, and so destructive is even the accusation of it, of all social right and privilege, that the law considers that the accusation is a coercion which men cannot resist. This seems to be the only case in which a threat to prosecute, will supply the place of actual force." [13]

It seems clear enough that a threat of an accusation of a verbal invitation to sodomy is as terrifying as a threat of accusation of sodomy itself; perhaps more so because even less susceptible of defense.

The public has a peculiar interest in the problem before us. The alleged offense, consisting of a few spoken words, may be alleged to have occurred in any public place, where any citizen is likely to be. They may be alleged to have been whispered, or to have occurred in the course of a most casual conversation. Any citizen who answers a stranger's inquiry as to direction, or time, or a request for a dime or a match is liable to be threatened with an accusation of this sort. There is virtually

7. 1947, 82 U.S.App.D.C. 236, 242, 163 F. 2d 844, 850.

8. We followed the same course in respect of accomplices in Borum v. United States, 1932, 61 App.D.C. 4, 56 F.2d 301, certiorari denied sub nom. Logan v. United States, 1932, 285 U.S. 555, 52 S.Ct. 459, 76 L.Ed. 944. And we did it in respect of private detectives in Gassenheimer v. United States, 1906, 26 App.D.C. 432. See also Copeland v. United States, 1945, 80 U.S.App.D.C. 308, 152 F.2d 769, certiorari denied, 1946, 328 U.S. 841, 66 S.Ct. 1010, 90 L.Ed. 1615; Medley v. United States, 1946, 81 U.S.App.D.C. 85, 155 F. 2d 857, certiorari denied, 1946, 328 U.S. 873, 66 S.Ct. 1377, 90 L.Ed. 1642;

Mundy v. United States, 1949, 85 U.S. App.D.C. 120, 176 F.2d 32.

9. The rule as to the required quantum of proof in perjury cases is a judge-made rule. See Weiler v. United States, 1945, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495.

10. Bates v. Bates, 1943, 153 Pa.Super. 133, 33 A.2d 281. See also 1 Wharton, Criminal Law § 762 (12th ed. 1932) and cases cited in note 5 thereto.

11. 4 Bl.Comm. 215.

12. 2 Wharton, Criminal Law § 1089 (12th ed. 1932).

13. Long v. State, 1852, 12 Ga. 293, 319, citing authorities.

no protection, except one's reputation and appearance of credibility, against an uncorroborated charge of this sort. At the same time, the results of the accusation itself are devastating to the accused. The gratuitous solicitation of a total stranger for a perverted act is a phenomenon on the outer fringes of behavior. While technically this offense is a minor misdemeanor and in the catalog of crimes is graded as less serious than reckless driving, in the practical world of everyday living it is a major accusation.

It follows that threatened accusation of this offense is the easiest of blackmail methods. The horror of the ordinary citizen at the thought of such an accusation may impel him to comply with a demand for money under such a threat. The public has a great interest in the prevention of any such criminal operation.

■ So, as in all acute conflicts between public interests or between public and private interests, the law must be exceedingly careful in its processes. While enforcement of this particular statute must seek the prevention of the offense, it must also seek to prevent unwarranted irreparable destruction of reputations, and it must seek to prevent the equally criminal offense of blackmail; it must not foster conditions or practices which make easy and encourage that offense. Adjustment of methods to foster all these objectives is not simple, and the balancing of the conflicting public interests involved is not easy, but within limits such achievements are possible.

■ The problems of quantitative requirements of proof in criminal cases are neither new nor novel. They are among the contrarieties between the civil law and the very ancient common law. They have been discussed at length by the authorities.[14] While Professor Wigmore reflects an opposition to all quantitative requirements, in discussing the rationale of the two-witness rule in prosecutions for treason he states succinctly a proper principle. He says: "The true solution seems to depend on the relative proportion, in experience, of two elements, namely, the likelihood of false accusations, as compared with the harm of a guilty person's escape. When the former (relatively to the specific crime) is large, and the latter (relatively to the specific crime) is small, then the two-witness rule may be justified as being often effective, and seldom harmful when not effective." [15] By that standard a quantitative measure of proof in cases such as the one now before us, *i.e.,* in prosecutions for an invitation to a perverted sexual act, would clearly be justified, because the likelihood of false accusations is enormous and the harm done by failure to convict is relatively very small.

All the foregoing considerations impel toward a binding rule as to proof in these cases. At the same time, there is a powerful consideration which operates against such absolute requirements. Rigid quantitative requisites of proof would seriously restrict prosecutions for this offense and to that extent impair enforcement of the statute. Probably only rarely is this offense committed in the presence of a third person, and only rarely is the verbal invitation corroborated by some proven circumstance which establishes that the invitation has actually been made.

In this situation we shall follow the course to which we have already referred, and which we have upon occasion followed in the past. We shall, for the present, refrain from imposing rigid requirements as to quantity or character of proof in these cases, but we call to the attention of the trial courts certain considerations which we think should govern them in respect to these charges. We counsel them thus in three respects.

■ In the first place, the testimony of a single witness to a verbal invitation to sodomy should be received and considered with great caution. The great public interest that charges of this offense be not preferred without sound foundation requires

14. See, e.g., 7 Wigmore, Evidence § 2030 et seq. (3d ed. 1940); 2 Wharton, Criminal Evidence § 912 et seq. (11th ed. 1935); 3 id. § 1395 et seq.

15. 7 Wigmore, Evidence § 2037 (3d ed. 1940).

that there be a known strictness on the part of the courts which will serve to deter prosecutors in dubious cases.

■ In the second place, we emphasize that what we said in Villaroman v. United States[16] concerning evidence of good character, is particularly applicable to this class of cases. Perhaps, in respect to the ordinary misdemeanor, evidence of established good character is not particularly impressive, because men of established good character frequently commit minor offenses of various kinds. But it is less than likely that a man who would invite a stranger in a public park to participate in a perverted sex act could present credible witnesses of his good character in respects relevant to that issue. Moreover, as we have pointed out, evidence of good character is usually the only defense, except his own word, that an accused has against a charge of this sort.

■ In the third place, we counsel that the trial courts require corroboration of the circumstances surrounding the parties at the time, such as presence at the alleged time and place and similar provable circumstances.

We said above that "for the present" we would leave the solution of this problem to the observations just made. We believe that adherence by prosecutors and courts to these precautions will largely eliminate the possibilities of abuse. If such does not prove to be the case, another opportunity can be taken to establish other protections.

■ Turning now to the case before us, we find it short of the proof required for conviction. Briefly, the sole testimony to the offense was the word of one witness, corroborated only by the facts that the accused was in the park, that he had a conversation with the officer and invited the officer to his apartment, and that they walked together toward the accused's car. On the other side are (1) the unequivocal testimony of the accused; (2) the fact that the accused, immediately upon his arrest, not only denied the offense and denounced the arrest but instantly, vigorously and emphatically asserted that he would sue the officers and the District Government for their action; (3) the fact that the accused had a roommate and knew that the roommate was then at the apartment; (4) the abundant character evidence in favor of the accused; (5) the reasonable explanation of the accused as to why he was in the park at the time; (6) the wholly disinterested testimony that the officer testified falsely on at least one point as to which he could not have been mistaken; and (7) the interest of the officer in making arrests for this offense, shown by his making six such arrests on this one evening in this one place.

The officer said the accused spoke the offensive words; that is the sole testimony to that effect. His fellow officer knew only that a conversation occurred between the accused and Manthos. There is no dispute about the fact that this officer made many similar arrests for the same offense in the same park on this same evening. There is no dispute about the facts that this accused was a man of good character—ten friends and fellow employees of unquestioned standing were emphatic about it—and that he knew that his roommate was actually in their apartment at the time when he (the accused) was supposed to be inviting the officer to the apartment for an immoral purpose. There is no dispute about the fact that the accused's explanation of his presence in the park was a natural one; there was a White Tower restaurant on the corner, and it is common knowledge that many people go to these all-night restaurants for something to eat about this time of night. Kelly's explanation of how the conversation originated was reasonable; it is not unreasonable, under the circumstances here pictured, to believe that Manthos first said "Hi" to Kelly and not Kelly to Manthos; after all, Manthos was in the park

16. 1950, 87 U.S.App.D.C. 240, 242, 184 F.2d 261, 263: "* * * good character, when considered in connection with the other evidence in the case, may generate a reasonable doubt; and * * * the circumstances may be such that an established reputation for good character, if relevant to the issue, would alone create a reasonable doubt, although without it the other evidence would be convincing."

for the purpose of making arrests for this offense. Into the scale with those unquestioned facts goes the word of the accused in flat contradiction of the officer's testimony, and the disinterested testimony of the probation official that Manthos testified falsely in one respect. Added together, that evidence inescapably, it seems clear to us, produces a reasonable doubt as to guilt. It seems to us that the uncorroborated word of this particular officer under these particular circumstances could not establish beyond a reasonable doubt that this defendant was guilty of this offense. The inescapable doubts are reasonable ones. We have many times reviewed the sufficiency of the evidence in criminal cases and have upon occasion reversed for lack of sufficient evidence to convict.[17] We are of clear opinion that this judgment of conviction must be set aside for lack of the requisite proof to convict.

Reversed.

PROCTOR, Circuit Judge (dissenting).

Although the majority disclaim any present intention to lay down rules prescribing the quantity or character of evidence to establish the offense of which appellant was convicted, nevertheless I think the practical effect of their opinion is to do so. Obviously they expect their "counsel" to the judges of the Municipal Court to be followed or else they would not offer it. Moreover, the judgment of the trial court is reversed for what the majority consider insufficient evidence according to standards of proof laid down by them.

I see no need for special rules of evidence for the trial of a misdemeanor, with relatively slight punishment, when long experience has proven such rules to be unnecessary for trial of the gravest felonies. The majority insist that special concepts are necessary to shield the innocent from blackmail and perjury. But how can rules of evidence protect if the severe penalties for those crimes will not avail? What relevancy is there between an *act* of blackmail or perjury on the one hand and the trial of an accused for inviting to lewd or immoral acts on the other?

Doubtless this court has power to formulate rules of criminal evidence, but that power should be, and has been, sparingly used. I can see no reason for invoking it in the present circumstances. Why translate into legal precepts simple processes of reasoning naturally involved in the consideration and solution of a purely factual question? During the history of this court, some 58 years, it has not originated a single rule prescribing the quantity or character of evidence to prove a particular crime. In a few instances, as in rape and perjury, it has followed, with some dilution, rules emerging through ancient English law, requiring varying measures of proof.[1] But more enlightened principles, of universal application, have made special rules unnecessary even for the gravest crimes.[2] The burden upon the prosecution to prove guilt beyond a reasonable doubt[3] and the privilege of a defendant to testify in his own behalf[4] are both of relatively recent origin. Those protecting shields, with the presumption of innocence[5] and the right to assist-

17. See, e.g., Williams v. United States, 1940, 71 App.D.C. 377, 110 F.2d 554, which was upon an information under the same statute involved in the present case; Hammond v. United States, 1942, 75 U.S.App.D.C. 397, 127 F.2d 752; Williams v. United States, 1944, 78 U.S. App.D.C. 322, 140 F.2d 351.

1. Rape, Ewing v. United States, 1942, 77 U.S.App.D.C. 14, 135 F.2d 633; Kidwell v. United States, 1912, 38 App.D.C. 566; and perjury, Maragon v. United States, 1950, 87 U.S.App.D.C. 349, 187 F. 2d 79, certiorari denied, 1951, 341 U.S. 932, 71 S.Ct. 804, 95 L.Ed. 1361; Cook v. United States, 1906, 26 App.D.C. 427.

2. 7 Wigmore, Evidence § 2044 (3d ed. 1940).

3. Origin, about 1798, 9 Wigmore, Evidence § 2497 (3d ed. 1940); 10 Am.L.Rev. 642, 656.

4. Denied at Common Law. Established in States in 19th Century, beginning with Maine in 1864. In federal courts by statute of 1878, former Title 28 U.S.C. § 632, now 18 U.S.C. § 3481, Fed.R.Crim.P. 26, 18 U.S.C.

5. Coffin v. United States, 1895, 156 U.S. 432, 15 S.Ct. 394, 39 L.Ed. 481; Wolf v. United States, 4 Cir., 1916, 238 F. 902; 1 Wharton, Criminal Evidence § 200 (11th ed. 1935).

ance of counsel,[6] buttressed by impartial judgment of conscientious and intelligent judges and jurors, are the real safeguards against a false accuser.

The majority declare that in prosecutions like the present emphasis must be accorded evidence of good character. In support of the proposition they refer to the Villaroman case, 1950, 87 U.S.App. D.C. 240, 184 F.2d 261. But that opinion does not suggest that special weight be given to character evidence in any particular type of case. It deals generally with the possible effects of character evidence, without reference to the nature of the charge. It gives no support to the view that character evidence shall be given special consideration in any case. I think the proposition is unsound. Logically— and legally, the weight of any evidence in any case must depend alone upon its persuasive quality when considered in the light of all the other evidence.

Judged by prevailing standards it cannot be fairly held that in the present case the evidence was insufficient to support the finding of guilt by the trial judge. There was positive testimony of the invitation and corroborative evidence of surrounding circumstances. Whether that evidence would have convinced me of guilt beyond a reasonable doubt I would not presume to say. It did convince the judge charged by law with determining that vital question. Yet the majority, going beyond what I believe to be the legitimate bounds of appellate review, have assumed to retry the case upon a cold, printed record, and thus have found the evidence insufficient to establish guilt beyond a reasonable doubt. To support this action cases are cited in which they say this court has reversed "for lack of sufficient evidence to convict." However, an examination of those cases will show that they were reversed because of a

failure of substantial evidence to prove an *essential element of the charge.* Here, however, in the face of substantial proof of all elements, the majority have assumed authority to weigh the evidence and to determine whether it convinces of guilt beyond a reasonable doubt. I cannot reconcile this action with the opinion of this court in Curley v. United States, 1947, 81 U.S.App.D.C. 389, 160 F.2d 229, certiorari denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L. Ed. 1850, wherein Judge Prettyman, in keeping with established authority, said: "The decision in the case rests squarely upon the rule of law governing the action of the trial judge upon the motion for directed verdict of acquittal and the action of an appellate court upon a verdict of conviction. *We agree, as Curley contends, that upon the evidence reasonable minds might have had a reasonable doubt. As much might be said in many, if not in most, criminal cases."* [7] 81 U.S.App.D.C. at page 397, 160 F.2d 229, 237. Then after pointing out the possibility of a reasonable doubt arising from certain evidence in Curley's favor, the opinion continues, "But, as we have stated, that possibility is not the criterion which determines the action of the trial judge upon the motion for directed verdict and is not the basis upon which this court must test the validity of the verdict and the judgment. If the evidence reasonably permits a verdict of acquittal or a verdict of guilt, the decision is for the jury to make. In such case, an appellate court cannot disturb the judgment of the jury. *If we ourselves doubted Curley's guilt, that doubt would be legally immaterial, in view of the evidence and the rule of law applicable."* [8] 81 U.S.App.D.C. at page 397, 160 F.2d 229, 237. I agree with that statement of the law. I must therefore disagree with the majority opinion in the present case.

6. U.S.Const. Amend. VI.

7. Emphasis added.

8. Emphasis added.