Catherine **HOPKINS**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 14939.

United States Court of Appeals District of Columbia Circuit.

Argued Sept. 10, 1959.

Decided Dec. 11, 1959.

Petition for Rehearing En Banc Denied Jan. 19, 1960.

Mr. Stanley M. Dietz, Washington, D. C., for appellant.

Mr. Nathan J. Paulson, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., and Carl W. Belcher, Asst. U. S. Atty., were on the brief, for appellee.

Before EDGERTON, WASHINGTON and BASTIAN, Circuit Judges.

EDGERTON, Circuit Judge.

Appellant was convicted of attempting an abortion, which resulted in death, on or about March 3, 1956. She waived trial by jury and was tried by a judge.

She was indicted June 4, 1956, and pleaded not guilty June 8, 1956. But she was not tried until 29 months later, in November 1958. She spent two months of the intervening time in the District of Columbia General Hospital, and more than two years in the government mental hospital of St. Elizabeths.

At appellant's trial, Dr. Schultz, Chief Psychiatrist at the District of Columbia General Hospital, testified that she was admitted there June 26, 1956, and that her "discharge diagnosis * * * was schizophrenic reaction, schizo-effective type." On August 30, 1956, she was transferred to St. Elizabeths. Dr. Pettit, Clinical Director for Branch 1 at St. Elizabeths, testified that her condition was diagnosed there as "schizophrenic reaction, chronic undifferentiated type", and that when she came under his observation in November, 1956, he concurred in this diagnosis.

In April, 1958, appellant was transferred to the "chronic division" of St. Elizabeths. Dr. Hoye of that division testified that "She was suffering from schizophrenia reaction, chronic undifferentiated type." After reviewing her case history, Dr. Hoye concluded that she had been "suffering from schizophrenic illness since 1952."

Thus three government psychiatrists, in two government hospitals where appellant was long under observation, beginning soon after the attempted abortion, testified that she was schizophrenic. No psychiatrist testified that she was not schizophrenic.

Appellant's mother testified that after an ear operation when appellant was 8 years old, "She would stay home all day long and wouldn't say anything to me. * * * I would ask her different questions. She wouldn't talk to me, you know. She just acted plum different." She did not play with other children as her sister did. "When she got fifteen and a little older she still told me she couldn't sleep at night and told me she heard voices. * * * She wanted to jump out of the window. She got on the floor and commenced pulling her hair out.

When she went to jump out the window my son-in-law and I grabbed her. * * * She called the undertaker and sent him to a girl friend's home on Eleventh Street. She sent flowers to the girl, and told me the girl was dead. And I called and they said she wasn't dead." In 1951 the mother took appellant to D. C. General Hospital for mental observation.

Laymen who had no previous acquaintance with appellant, but talked with her at various times after the attempted abortion, testified that they observed no abnormal conduct and thought her sane. Two doctors who were not psychiatrists gave similar testimony in similar circumstances. It does not appear that either had occasion to, or did, undertake a mental examination of appellant. Accordingly both made it clear that they were not expressing professional opinions. Dr. Robert Smith, an intern in the gynecology ward at D. C. General Hospital, testified that the appellant "was not specifically my patient. I think perhaps she was the patient of Dr. Trotta who was the other intern. * * * I would see her and maybe talk with her occasionally, but not professionally." The prosecutor asked Dr. Smith: "As a layman and not in your capacity as a physician did you notice anything abnormal by way of activity, or speech, or anything about Catherine Hopkins—in other words, as a layman, can you tell His Honor from what you saw and heard of her was she crazy or sane when you saw her over there?" Dr. Smith replied: "She—well, as far as I am concerned, she was sane." Dr. Rovner, Resident Physician in Obstetrics and Gynecology at D. C. General, talked with her while treating her for an incomplete abortion. The prosecutor said to him: "I want you, if you will, doctor, as a layman, tell His Honor whether or not, based on your observation of this defendant Hopkins, and hearing her talk and seeing her actions, tell His Honor, as a layman, whether or not in your opinion during her time in the hospital she was crazy or of sound mind." He replied: "At the times I had occasion to speak to her or con-

verse with her, she appeared to be of sound mind. She was lucid and rational and answered questions in a normal manner."

■ As we said in Carter v. United States, 102 U.S.App.D.C. 227, 237, 252 F.2d 608, 618, "while a lay witness's observation of abnormal acts by an accused may be of great value as evidence, a statement that the witness never observed an abnormal act on the part of the accused is of value if, but only if, the witness had prolonged and intimate contact with the accused." This case resembles Satterwhite v. United States, 1959, 105 U.S.App.D.C. 398, 267 F.2d 675. Cf. Douglas v. United States, 1956, 99 U.S.App.D.C. 232, 239 F.2d 52.

That the attempted abortion was performed in an outrageous and brutal manner is not evidence that the appellant was sane.

■■ An "accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect." Durham v. United States, 1954, 94 U.S.App.D.C. 228, 241, 214 F.2d 862, 875, 45 A.L.R.2d 1430. "When this defense is raised, the response of the Government may be one or the other (or both alternatively) of two propositions:

(1) that the accused had no mental disease or defect or (2) that even if the accused had a mental disease or defect the alleged criminal offense was not the product of the infirmity. * * * In order to convict, the jury must be convinced beyond a reasonable doubt either (1) that the accused had no mental disease or defect or (2) that, although the accused was defective or diseased, his act was not the product of the affliction." Carter v. United States, 1957, 102 U.S. App.D.C. 227, 234, 252 F.2d 608, 615. In the present case the government says it proved proposition (1). We disagree.[1]

■ "The nature and quantum of evidence of sanity which the Government must produce to sustain its burden and take the issue to the jury will vary in different cases. Evidence of sanity which may suffice in a case where defendant has introduced merely 'some evidence' of insanity may be altogether inadequate in a case where the evidence of insanity is substantial." Wright v. United States, 1957, 102 U.S.App.D.C. 36, 39, 250 F.2d 4, 7. In the present case the evidence of insanity was plainly substantial. It understates the matter to say that in our opinion all the evidence did not permit the trier of the fact to conclude beyond a reasonable doubt [2] that

1. There is no contention that the government proved proposition (2). The defense sought to prove, and the government to disprove, a causal relation between appellant's mental condition and the attempted abortion, but the testimony on this point was inconclusive. *E. g.*, on cross-examination Dr. Hoye testified as follows:

"Q. Well, you don't know whether the act of abortion performed by this defendant was or was not the product of the mental illness you speak of, do you? A. No, I said it could possibly be.

"Q. But you don't know that, doctor? A. It is only my opinion.

"Q. And your opinion in that regard— it wouldn't surprise you greatly if the act of abortion was not the product of the mental disease, would it? A. In her case I think it would."

2. We must reverse a criminal conviction when it is "clear to us that upon the evidence * * * a reasonable mind must necessarily have had a reasonable doubt

as to * * * guilt." Cooper v. United States, 1954, 94 U.S.App.D.C. 343, 345, 218 F.2d 39, 41. Hammond v. United States, 1942, 75 U.S.App.D.C. 397, 127 F.2d 752; Sleight v. United States, 1936, 65 App.D.C. 203, 82 F.2d 459; Maryland & Virginia Milk Producers Ass'n v. United States, 1951, 90 U.S.App.D.C. 14, 193 F.2d 907; Benton v. United States, 88 U.S.App.D.C. 158, 188 F.2d 625; Kelly v. United States, 90 U.S.App. D.C. 125, 194 F.2d 150; and Wilson v. United States, 1959, 106 U.S.App.D.C. 226, 271 F.2d 492, illustrate this principle. See also Farrar v. United States, 107 U.S.App.D.C. ——, 275 F.2d 868. Cf. Yates v. United States, 354 U.S. 298, 331, 77 S.Ct. 1064, 1 L.Ed.2d 1356.

There is nothing new about applying this familiar principle to the issue of insanity. In Douglas v. United States, 1956, 99 U.S.App.D.C. 232, 239, 239 F.2d 52, 59, we said: "We find it impossible to hold in the face of the generally uniform testimony of the three dis-

appellant had no mental disease or defect. We by no means suggest that lay testimony may not, in some circumstances, be reasonably thought so far to outweigh psychiatric testimony as to prove sanity beyond a reasonable doubt. We deal only with the circumstances before us.

For purposes of comparison, we suggest a hypothesis. Suppose the question were, as it sometimes is in an abortion prosecution, whether the woman was pregnant; three gynecologists, each of whom examined her professionally for the purpose of determining whether she was pregnant, testified positively that she was not; two psychiatrists, each of whom talked with her but neither of whom examined her, testified, expressly "as laymen", that she looked pregnant to them; and several laymen testified to similar effect. It would hardly be contended that the prosecution could be thought to have proved pregnancy beyond a reasonable doubt.

 Without regard to other questions, we reverse the conviction and remand the case with instructions that unless the government advises the District Court, without unreasonable delay, that it can meet its burden of proof at a new trial, the appellant is to be acquitted on the ground of insanity, committed to a mental hospital, and dealt with in accordance with D.C.Code (Supp. VII, 1959) § 24–301; namely, hospitalized until she is free from such abnormal mental condition as would render her dangerous to herself or the community in the reasonably foreseeable future. Overholser v. Leach, 1958, 103 U.S.App. D.C. 289, 257 F.2d 667, cert denied 1959,

359 U.S. 1013, 79 S.Ct. 1152, 3 L.Ed.2d 1038.

Reversed and remanded.

BASTIAN, Circuit Judge (dissenting).

Appellant was convicted of an attempted abortion resulting in death, punishable, under the D.C.Code,[1] as second degree murder. The attempted abortion was performed in an outrageous and brutal manner, the details of which are too repulsive for recital as a part of this opinion. Although the able counsel for appellant has raised the issue of the sufficiency of the evidence to implicate her in this crime, the evidence as to appellant's guilt is overwhelming; and the fact is that counsel's main reliance is on the failure of the District Court to direct acquittal on the ground of insanity.

The case was heard by the court without a jury and, after the conclusion of the evidence, the judge set forth his findings recognizing the duty of the Government to prove the sanity of appellant beyond a reasonable doubt and holding that the Government had done just that. The principal evidence presented by the Government on the issue of insanity was the testimony of two medical doctors (not psychiatrists) associated with the District of Columbia General Hospital, who had examined appellant within three weeks following the crime in question.

One doctor testified that he had seen appellant occasionally during the time she was in the D. C. General Hospital. He stated that, insofar as he was concerned, she was sane and that he had noticed nothing abnormal about her behavior. He testified that he was present

interested psychiatrists, the only ones who testified, that this test essential to the validity of the verdicts was met. On any rational view of this evidence, emanating from Government sources, reasonable doubt existed as to Douglas' sanity * * *. True, there was non-expert testimony. But this, as will be seen from its outline earlier in this opinion, cut both ways * * *. Our judicial conclusion that as a factual matter a reasonable doubt was created by the disinterested medical testimony, coupled with the adjudication of unsoundness of mind and the hospitalization for eighteen months, is not changed by the lay witnesses who testified only as to Douglas' conduct during the robberies and shortly thereafter." See also Satterwhite v. United States, 105 U.S.App.D.C. 398, 267 F.2d 675.

1. § 22–201 D.C.Code, as amended.

when appellant was confronted with the decedent, at which time the decedent recognized appellant as the person who had performed the abortion for $50. Although vigorously cross-examined, he stated that during his contacts with appellant "I noticed no abnormal behavior which would lead one to think she was not of her own mind."

The other doctor testified that appellant was under his care while she was in the hospital, that he saw her once or twice a day during that time, and that, when he had occasion to speak with her, she appeared to be of sound mind, was lucid, rational and answered questions in a normal manner. He also was present when appellant was confronted with the decedent, and saw no indication that she might possibly be psychotic, nor did she have an anxiety complex.[2]

In addition to this medical testimony, the court had before it the testimony of three experienced police officers, all of whom were familiar with evidences of mental disturbance and had seen persons who were mentally disturbed. All three officers testified that there was no evidence of mental derangement on the part of appellant when they questioned her shortly after the crime was committed.

In support of the defense of insanity, four psychiatrists testified for the defense, all of whom were of the opinion that appellant suffered from schizophrenic reaction at the time of their examination. However, their testimony was, to say the least, equivocal and in addition, in my opinion, wholly unsatisfactory. One psychiatrist, who examined appellant some two years after the crime, testified that the crime "could possibly be" the product of mental illness although it was just as probable that it was not. Another psychiatrist, who examined appellant some months after the crime, testified that the crime was not a direct but rather an indirect product of mental

illness. A third psychiatrist, who examined appellant more than five months after the commission of the crime, testified that "possibly" the crime was the product of mental disease, and defined "possible" as being somewhat less than "probable." The testimony of the remaining psychiatrist aids neither the Government nor appellant in any respect whatsoever.

The District Court Judge was thus faced with the question of whether, since some evidence of insanity had been introduced by the defense, the evidence on the part of the Government was sufficient to prove appellant sane beyond a reasonable doubt. The District Court held that the Government did carry its burden, and rendered the verdict of guilty.

In his oral opinion, the trial court reviewed the testimony in detail and recognized the fact, and applied the principle of law, that the burden was on the government to establish guilt beyond a reasonable doubt, including the issue of insanity. The court said in part:

"Of course, the Court is sitting without a jury and is performing the function of a jury, and the question here, and the sole question is whether or not all the evidence supports the plea of insanity as to a reasonable doubt as to the mental condition or the product of the mental condition of this defendant on March 3, 1956 [the date of the alleged abortion].

"On that date the defendant was in her home. She received several telephone calls from the deceased woman upon whom an abortion or attempted abortion had been made.

"She went to that woman's home and shortly afterward she telephoned for her sister, Mrs. Simmons, to come there.

"Mrs. Simmons came there and there was quite a bit of conversa-

2. It is clear that a physician or surgeon is competent to testify on matters of insanity, certainly if based upon his personal observation, even though he is not a specialist in diseases of the mind (see 54 A.L.R., note, page 863); and the weight of such testimony is for the trier of the facts. Cf. Sher v. De Haven, 1952, 91 U.S.App.D.C. 257, 262, 199 F.2d 777, 782, 36 A.L.R.2d 937.

tion, apparently on the part of the deceased person and unquestionably others, that she wished to get rid of a child * * *.

"The sister testified that she told the defendant not to do anything that would get her into trouble. The sister was then asked to go downstairs and look after the young child of the deceased and to answer the door if anybody should come. She went downstairs and the little girl took her out in the back yard, she says, to look at some puppies, and then she returned upstairs.

"I do not see any hallucinations there. I do not see any evidence of imaginary figures there, and I am talking about this particular day. Those are the facts, as I remember them, that occurred March 3, 1956.

"It is very clear that on that date an abortion was attempted or an abortion was accomplished. It would seem from all the evidence here that it was the defendant who had made the attempt of the crimes or crime with which she is charged."

With regard to the testimony of the sister, the court called attention to the fact that the sister had signed a statement. He continued:

"Mrs. Simmons [defendant's sister] testified that she and her husband brought the decedent to the hospital. Mrs. Simmons signed a statement also. She said it was read to her. She didn't read it, but nevertheless she signed it, and I am sure, taking into consideration the natural interest a mother and sister would have in the welfare of a sister or daughter.

"I have to comment to myself upon the fact that everything in the statement that was signed by Mrs. Simmons that did not go to reflect guilt on the part of the defendant was admitted. The crucial portion of that statement she couldn't remember. She didn't think it was done. There was nothing in the testimony of Mrs. Simmons to show the defendant was not a normal person on March 3, 1956."

With regard to appellant's confrontation of the decedent, at which appellant sought to excuse herself because the decedent had taken other measures, the judge commented:

"This isn't, to my way of thinking, as a reasonable man, that the defendant did anything except what a normal person would do."

With regard to the Government's case, the trial judge called attention to the fact that:

"We have had police officers on the stand. They are accustomed to being around the unfortunate fringe of humanity, and they testified with respect to the conduct of this defendant when they saw her and talked to her. She appeared to be lucid and talked to them as a person with a normal mind would do.

"The doctors who had her in their charge there all testified, not from a medical standpoint or as experts at all, that they had conversed with her and watched her actions and there was nothing out of the normal there."

With regard to the psychiatrists, the court, in his opinion, stated:

"Now, we come to the psychiatric defense. All of these doctors are highly skilled persons and I have a great deal of respect for them. They all testified as best they could. However, they admitted, or I think Dr. Schultz admitted specifically, that there is an area in their particular science or art that you can't fathom. You just don't know. Maybe there is, and maybe there isn't. It is possible or it is probable.

"You may recall that I interjected a couple of times, 'There is that word "probable" again.' I am just wondering what weight should be given to testimony of that character.

"As a reasonable person, and I am talking now as though I am the jury, which I am, but taking all the psychiatric testimony for what it is worth, what is it and would that make an impression on my mind? Would I have a reason to think the defendant was acting under some impulse generated by a defective mind? As a reasonable person would I think that?

"If there had been testimony of a psychiatrist who had seen her shortly afterwards or shortly before, their testimony might have been different. I thought this morning Dr. Harris, the psychiatrist, made a better impression on me than did the others. But this is a science that is reaching into the unknown and they cannot give any positive force by saying probably, or maybe, or possibly.

"So, in view of what I said—if I have misquoted the record I would like to have it called to my attention —it seems to me that this case, or the decision in this case is not governed by the Wright, or Fielding case, or the Durham case, at all.

"Therefore, I hold that the defendant, in view of what I have said, and I trust my memory has been accurate, is guilty of the second count of the Indictment, to wit: an attempt, by means of a catheter, to procure an abortion and miscarriage."

It is to be borne in mind that the trial judge had the benefit of observation of the witnesses' demeanor on the stand and was thus in better position than this court to determine whether the Government had carried its burden. I think I should add that even on the cold, printed record before me I would have reached the same conclusion as did the trial judge, in view of the testimony introduced on behalf of the Government and the, to me, unsatisfactory testimony for the defense on the subject of insanity.

The law applicable to burden of proof in insanity cases presently in force in the District of Columbia is stated by a panel of this court in Carter v. United States, 1957, 102 U.S.App.D.C. 227, 234, 252 F. 2d 608, 615:

"* * * To claim exemption from responsibility for a criminal act an accused must assert two conditions: (1) that he suffered from a mental disease or defect and (2) that his alleged criminal act was the product or result of that disease or defect. *When this defense is raised,* the response of the Government may be one or the other (or both alternatively) of two propositions: (1) that the accused had no mental disease or defect or (2) that even if the accused had a mental disease or defect the alleged criminal offense was not the product of the infirmity." [Emphasis added.]

I feel that, even assuming that the defense, by evidence, asserted (1) that appellant "suffered from a mental disease or defect and (2) that [her] alleged criminal act was the product or result of that disease or defect," [3] the Government nevertheless established its case beyond a reasonable doubt—as the trial court found.

---

3. I seriously doubt that any satisfactory evidence was introduced to the effect that the crime was the product of a mental disease or defect; in fact, the evidence as to *any* mental disease or defect was barely—if at all—sufficient to overcome the presumption of sanity. The test laid down in Davis v. United States, 1895, 160 U.S. 469, 488, 16 S.Ct. 353, 358, 40 L.Ed. 499, is as follows:

"If the whole evidence, including that supplied by the presumption of sanity, does not exclude beyond reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal of the specific offense charged."

Here the evidence clearly and conclusively, and beyond a reasonable doubt, established against appellant the issue as to her sanity even without the evidence "supplied by the presumption of sanity."

In addition to Carter, the majority relies heavily on Satterwhite v. United States, 1959, 105 U.S.App.D.C. 398, 267 F.2d 675. Both Carter and Satterwhite are clearly distinguishable.

In Satterwhite, approximately one month after the commission of the crime there involved, the defendant was examined by a psychiatrist at D. C. General Hospital and found to be suffering from schizophrenic reaction of a paranoid type. With reference to this diagnosis, the court stated:

" * * * Thus was yielded the inference that such diagnosis following so shortly after the commission of the offense, related back to and included the time of the offense."

In effect the court was stating that the disease was probably active at all times from the commission of the crime to the date of the examination.

The majority apparently relies on a similar inference in the present case. However, if such inference be present, and I doubt that it is, it was rebutted by the testimony of the medical doctors and the three police officers. It is quite clear from the testimony of the psychiatrists that their reason for not venturing a specific opinion as to appellant's sanity on the day of the crime was the peculiar nature of her mental disease. The psychiatrists' testimony reflected that a characteristic of the particular mental disease in question was that the person suffering therefrom went through periods of remission, during which time he acted normally.

Thus, the fact that appellant was found to be rational, coherent and sane by the medical doctors and the police officers at a period just subsequent to the crime and prior to the psychiatric examination rebuts the inference that the schizophrenic diagnosis "related back to and included the time of the offense," as was found in Satterwhite.

Although the defense raised the issue of insanity, I do not believe, as I have previously stated, that there was any satisfactory evidence that appellant was suffering from any mental disease or defect on the date of the crime, or that the crime was the product of a mental disease or defect. Therefore, the introduction of reliable testimony by the Government that appellant was rational, coherent and normal a relatively short period of time after the crime sufficiently rebuts the defense raised. Hence, I find that the District Court was not in error in declining to find appellant not guilty by reason of insanity and in finding appellant guilty as charged.

I further find, as above stated, that the majority's reliance on Carter is misplaced. Here, as distinguished from that case, there was more than lay testimony. There was the expert testimony of the medical doctors, not psychiatrists it is true, and we cannot put such testimony on the same level as that of purely lay witnesses.[4] To do that would surely and certainly eliminate trial by court or jury in cases where the defense of insanity is raised and would result in trial by psychiatrists. I do not believe this is what the majority intends but that certainly would be the result. Further, a reading of Carter shows that no medical testimony was introduced by the Government—a far cry from the instant case.

That appellate courts should be extremely chary in disturbing a verdict of the trier of facts is incontrovertible. When a case reaches this court, it is attended by certain presumptions of correctness. This would seem to be particularly true with respect to findings which rest upon the credibility of witnesses. The proposition that such a finding should not be disturbed on appeal was discussed at some length by Judge Wilbur K. Miller in his dissenting opinion in Farrar v. United States, 107 U.S. App.D.C. ——, 275 F.2d 868. I refer the

4. See opinion of this court on the value of medical doctors' testimony concerning emotional injuries. Hamilan Corp. v. O'Neill, 106 U.S.App.D.C. 354, 273 F. 2d 89, decided December 3, 1959.

reader to Judge Miller's discussion, with which I fully agree.

I feel that the record clearly demonstrates that there was adequate basis for the verdict of the District Court and that the judgment should be affirmed.