## BEALS *v.* FINKENBINER.

PATENTS; INTERFERENCES; PRIORITY; ABANDONED EXPERIMENT; EVIDENCE.

1. The decision of the Commissioner of Patents awarding priority to Finkenbiner *reversed,* since the evidence is not sufficient to overcome the presumption in favor of Beals arising from his having been the first to file his application.

2. The action of Finkenbiner in failing to manufacture the device for two years after his alleged reduction to practice, during which time there was a general demand in the trade for the device and specific demand was made upon him for a device performing its functions, and the attempt on his part to meet

the demand by devising some other form of device, raise the presumption that what was done amounted to no more than an abandoned experiment, and this presumption is not overcome by the statement of several witnesses that the test of the device was satisfactory.

3. In weighing testimony we are not bound to believe a particular fact, testified to by one or more witnesses, simply because they may not have been directly contradicted therein or impeached generally by evidence tending to show a want of reputation for veracity. The inherent probability or improbability of such fact is to be tested by unquestioned circumstances that surround the main transaction or occurrence, as well as by "the ordinary laws that govern human conduct."

No. 80. Patent Appeals. Submitted November 12, 1897. Decided December 14, 1897.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding. *Reversed.*

The facts are sufficiently stated in the opinion.

*Mr. John C. Pennie* and *Mr. A. C. Fowler* for the appellant.

*Mr. Henry Calver* and *Messrs. Church & Church* for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. This is an interference proceeding involving the following issues:

"1. A sewing-machine lap-seam feller consisting of two entirely separate and independent parts, one of which is provided with means whereby it is adapted to be attached to the work-plate of a sewing-machine, and the other of which is provided with means whereby it may be supported from above said work-plate, said parts having concave guiding edges arranged opposite to and thus facing each other, said concave guiding edges being approximately in the same horizontal plane, and having an unobstructed space or opening between them.

"2. A sewing-machine lap-seam feller consisting of two independent parts having concaved opposing guiding edges,

one of said parts being supported by the work-plate of a machine, and having a flexible top and the other of said parts being supported from above the said work-plate and having a flexible bottom."

The decision of the Examiner of Interferences in favor of the appellee, Finkenbiner, was reversed on appeal to the Examiners-in-Chief, and their decision in turn was reversed by the Assistant Commissioner, who awarded priority to Finkenbiner. From this last decision this appeal has been prosecuted.

The application of the appellant, Beals, for a patent was filed in the Patent Office April 23, 1894, and that of the appellee, Finkenbiner, July 17, 1894.

2. As is quite common in this class of cases, there is a mass of conflicting evidence in the record, which requires careful consideration and comparison in order to arrive at the merits of the controversy, but to review which in detail, in stating our conclusions, would require a great consumption of time and space that would not be compensated by any useful purpose that the same would subserve.

The following facts are either admitted or proved with reasonable certainty. The appellant, Beals, was a practical machinist and had once been employed by the Singer Manufacturing Co. He was on friendly terms with the officers of the said company at St. Louis, and through their recommendation and assistance he was employed in 1892 by the Premium Manufacturing Co., of St. Louis, as machinist at their factory. The business of that company was the manufacture of clothing, much of it overalls and trousers made of heavy duck and jeans. It operated several hundred sewing-machines, the greater number of which were purchased from the Singer Co., whose general manager at St. Louis was the appellee, Finkenbiner. The agency and superintendence of the latter covered several States and Territories, and the business required the services of a considerable number of employees. Among these

were several skilled machinists who repaired machines and attachments thereto, started them in operation in factories and worked on devices, attachments and improvements. Whilst Finkenbiner necessarily had practical knowledge in the matter of the construction and operation of the machines of the Singer pattern, it does not appear that he was a practical mechanic or machinist.

There was demand in 1892 among clothing manufacturers, which increased and became quite general in 1893 and early in 1894, for a lap-seam feller which, attached to a two-needle sewing machine operated by machinery for rapid work, would answer in making cross or overlapping seams in goods of thick, hard and heavy materials. There were several fellers and folders in use that worked well on ordinary seams, but would not admit of sufficient expansion to make the lap on cross seams without choking.

The Premium Company was very anxious to secure an operative feller for the above purpose, and made application to the Singer Company at St. Louis for attachments to accomplish it. At least two attachments of Singer make, one of which was called "the butterfly," were sent over for trial and found to be insufficient. Failing to obtain that which was wanted, Beals began attempts to make a device to answer the purpose. He made one in two pieces in October, 1893, and operated it sufficiently to demonstrate its utility. He continued to perfect his device to meet difficulties as they arose, and in March, 1894, it was used on a machine and made successfully thirty-five dozen of trousers and overalls in one day. Beals assigned an interest of one-half in his invention to John Greene, manager of the Premium Company; and the Standard Machine Company, a rival of the Singer Company, has an interest in it by subsequent contract. The application of Finkenbiner is prosecuted for the benefit of the Singer Company as assignee.

3. There being no doubt that Beals made his feller and operated it successfully, an attempt has been made to show

that he must have borrowed the idea from the model of the invention claimed by his opponent to have been previously made in the workshop and by the machinist under his control. That Beals had access to that shop and was occasionally there is true; but there is no testimony of weight sufficient to create more than a bare suspicion that he might, prior to his own conception and reduction to practice, have seen something that suggested the idea to him.

On the other hand, without regard to the sufficiency or the insufficiency of the proof tending to show that the model of the invention, as now claimed by Finkenbiner, was then in existence at all, certain unquestioned circumstances tend strongly to negative the suspicion that Beals may have seen and copied the same. According to Finkenbiner's evidence, the attachment of his invention was roughly made in December, 1892, tried on a machine, and then removed and put away. It was not sent over to be tried in the Premium Company's factory with the "butterfly" or any other. Beals' work was not concealed. It could have been seen by the machinists in appellee's employ on their visits to the factory. Appellee himself visited the factory in company with the Singer Company's Chicago agent in the spring of 1894, and saw the feller in operation. In April, 1894, Greene talked with the general manager of the Singer Company in New York, with a view to interesting him in the manufacture of the device, and sent him one, at his request, to be examined at the general manufactory. The point may be dismissed from further consideration.

4. As Beals is the senior applicant, the burden of proof is upon Finkenbiner to establish both conception and reduction to practice prior to October, 1893. Whether the exact date of Beals' reduction to practice be in October, 1893, or at any time up to March, 1894, is immaterial, because Finkenbiner alleges, and all of his evidence is directed to proving, his conception of the invention in 1892, and re-

duction to practice in or before the expiration of December of that year.

It is neither necessary nor important that we consume any time in considering the disputed question whether Finkenbiner really conceived the idea embodied in the issue of interference in 1892, as claimed.

If he had such conception, but failed to reduce it to practice before Beals did, then, as shown by his own evidence, he was not using such diligence in perfecting and utilizing his invention as would close the field to the later but successful entry of Beals.

Passing by the question of conception, then, to that of reduction to practice, we do not find the evidence of sufficient weight, under all the circumstances in connection with which it must be considered, to satisfy us that the appellee's conception, if embodied in the model shown, was reduced to practice in December, 1892, or at any time before Beals' invention was operated for commercial purposes. Assuming that he conceived the idea of a lap-seam feller in an attempt to supply the demand for one that would, on a machine operated by power, pass the cross lap-seams of heavy goods without choking, and that his witness Schwarz made a device embodying that conception in December, 1892, we can not find sufficient foundation in the evidence, when carefully weighed, to justify the belief that it amounted to anything more than an abandoned experiment.

It is true that four witnesses, or five (if one be counted who was called by the appellant), besides the appellee himself, say that this model feller was made and fitted to a two-needle machine and tested successfully in December, 1892.

Two of the witnesses called by the appellee differ from him and his two leading witnesses in some important particulars. The other two, Schwarz and Herman, and appellee himself, have been contradicted in other material points of the case by witnesses who, to say the least, appear on the record as equally credible.

The nature of this particular point, of course, did not admit of direct contradiction by the appellant.

In weighing testimony, we are not bound to believe a particular fact, testified to by one or more witnesses, simply because they may not have been directly contradicted therein, or impeached generally by evidence tending to show a want of reputation for veracity. The inherent probability or improbability of such a fact is to be tested by the unquestioned circumstances that surround the main transaction or occurrence, as well as by "the ordinary laws that govern human conduct." *Atlantic Works* v. *Brady*, 107 U. S. 192, 203; *Telephone Cases*, 126 U. S. 567.

One of the minor circumstances, of litle weight by itself, however, is that no sample of the seams said to have been stitched with the aid of the model feller was preserved. Again, just before or about the time of the alleged successful experiment, Marx & Haas, clothing manufactuters of St. Louis, had stated their want of a feller for cross lap-seams of heavy goods, and had sent to appellee's office a sample of thick lined goods to be examined and tried. Without experiment this sample was sent to the New York office of the Singer Company, from whence it was never returned.

No feller was sent to Marx & Haas, and they were not informed that a new attachment had been invented and might be ready at a later period.

Other and more important circumstances seem to be utterly irreconcilable with the fact that this invention had then been put in practical shape, thoroughly tested, and found to operate successfully.

There was in 1892, a demand, that grew rapidly in proportions, for a lap-seam feller that would do the work of the invention in controversy. No one knew this better than Finkenbiner. He was in close touch with the manufacturers, to whom it was his business to sell the machines and attachments of his company. It was not only part of his business to keep pace with the demands and needs of the

manufacturers, but also to respond to them. He said that the necessity of some such attachment was particularly brought to his attention "late in 1891 or early in 1892." It would be hard to account for his attention to the matter, or for his taking time, considering the many business cares that he says he had, to make the invention at all without some demand or apparent need for it. He says:

"The particular thing was to get an attachment which would make lap-seams running over lap-seams in heavy goods in doing this class of work."

He says again that this demand had been "called to his attention in a general way, and possibly in some specific cases." Marx & Haas have been mentioned, and he named a firm in the city of St. Joe. The Premium Company made repeated and urgent requests for such a feller early in 1893. A feller of Singer manufacture, called the "butterfly," was sent to them and was altered without satisfactory result. Another was made in the St. Louis workshop and sent or taken over, but proved inoperative. The machinists under the control of appellee made frequent visits to the factory, which was very near his office, in the course of attempts to supply the demand for a satisfactory feller. Schwarz took or sent over a device in the spring of 1894, upon which he had labored for some time and which he was confident would work. Trial demonstrated its failure. He then, and possibly before, saw the Beals invention at work. Now, with all this demand, and with at least two acknowledged attempts to make and adapt a feller to the use of the Premium Company, and with the assurance of sales of both attachments and machines that would necessarily follow the introduction of the feller, no attempt was made by Finkenbiner to revive or bring to light his completed and successful model of December, 1892. He did not even inform the general manager of the Singer Company at New York of his invention until some time in the summer of 1894. When he visited the factory of the Premium Company, in the spring of 1894,

in company with the Chicago manager of his own company, and saw his invention in actual commercial use as the invention of another, he said nothing to indicate his claim.

Schwarz admits that he worked on other plans, and finally made a feller in two parts, which was the one tried by the Premium Company in 1894 and found unsatisfactory. Finkenbiner admits that he was informed of this last construction.

Here the inevitable question presents itself, why all of this work on new plans and models when there was one then in the shop in complete working order which had been tested and proved to be the very thing that was wanted?

This question was not answered by the two machinists, Schwarz and Herman.

The answers or explanations of Finkenbiner given on cross-examination are far from being satisfactory. He was asked what was his motive after reducing his invention to practice in 1892 in taking the attachment from the machine and putting it away. His answer was: "At the time I was very busy in conducting the business, and had it taken off and put away until such time as I had time and wished to take it up again."

Schwarz, however, said that after the feller had been removed and put away it was referred to in making another on the same principle, but more convenient to handle, and that several times during 1893 Finkenbiner made sketches for him to work by.

Finkenbiner was also asked why he did not advise the Premium Company that he had invented such a lap-seam feller or folding attachment as had been called for. To this he replied: "We never advise the trade of what we have in progress until we are ready to place the article upon the market."

This is in direct conflict with the practice pursued with the Premium Company, as we have seen, and with another answer made by him. Having been asked about the fellers

sent to that company, he said : " I think there were a couple of models or forms shown that we made and some of our employees sent over there to be tested while I was absent. One, probably, was one of the first that was made which they had a couple of, of a different character, and another was a later one on a different principle. We frequently get up different kinds of attachments and folders to suit the different kinds of work, and often send them out to some of our friends to test them on practical work before we go any further with them, if they are not of too great importance, or where we know that they will do it in good faith."

When asked to explain his delay in making application for a patent, he answered : " This was only one of the many things that occupied my attention, and, as they frequently do, are worked on or completed as we get time to give them attention. I do not know of any special reason other than this why the matter was not taken up sooner." Beyond this statement of want of necessary time we have no evidence.

He was not engaged in making other inventions during the time. The business which he managed was well organized in every department, and provided with an ample corps of submanagers, machinists, salesmen and clerks, and nothing appears to show that he was engaged in extra or unusual work to such an extent that he could not have given the small amount of time only that was necessary to forward the model to the principal office and factory for examination, further trial, if desirable, and for manufacture.

Without going further into the testimony, we think enough has been said to justify the conclusion that the presumption in favor of Beals has not been overthrown.

The decision appealed from must therefore be reversed. It is so ordered, and this decision, with the proceedings herein, will be certified to the Commissioner of Patents, as required by law.

*Reversed.*