Henry W. **JACKSON**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 19134.

United States Court of Appeals
District of Columbia Circuit.

Argued June 16, 1965.

Decided Nov. 4, 1965.

McGowan, Circuit Judge, dissented.

Mr. George U. Carneal, Jr., Washington, D. C. (appointed by this court), for appellant.

Mr. Dean W. Determan, Sp. Asst. to Atty. Gen., for appellee. Messrs. David C. Acheson, U. S. Atty. at the time the brief was filed, and Frank Q. Nebeker and Joseph A. Lowther, Asst. U. S. Attys., were on the brief for appellee. Mr. Patrick H. Corcoran, Asst. U. S. Atty. at the time the brief was filed, also entered an appearance for appellee.

Before BAZELON, Chief Judge, and WRIGHT and McGOWAN, Circuit Judges.

WRIGHT, Circuit Judge:

This case is before us for the second time following appellant's conviction on two counts of narcotics violations. On the appeal from the conviction, we held that the trial judge had erred in refusing to allow appellant to cross-examine the police officer concerning the reliability of the informant who had given the information which led to appellant's arrest.

The case was remanded for a hearing on the issue of the informant's reliability. Jackson v. United States, 118 U.S.App. D.C. 341, 336 F.2d 579 (1964). On remand, after hearing the testimony of the police officer and the informant, the trial court concluded that "probable cause for the defendant's arrest existed and that he suffered no prejudice because of the arrest and therefore no new trial is required."

Officer Bello testified that on November 15, 1962, he and another officer were approached by one Ethel Gaskins who informed them that "a Negro male, five foot nine, 25 to 27 years, wearing a brown cap, a tan zipper waist-length jacket, green corduroy trousers, dark complexion," was in the Franklin Delicatessen and had heroin in his possession. On this information alone—the officers had never heard of appellant—the policemen entered the store, found appellant and another Negro male, and asked both of them to step outside. Once outside, a search first of the person arrested with appellant was unproductive. A subsequent search of appellant disclosed he was carrying contraband narcotics.

■ The District Court concluded that the quality of the information the officer allegedly received was clearly such as would normally lead directly to the suspect, and that the informant was reliable as she had previously given accurate information to Officer Bello. We agree that the information was sufficiently detailed so that the officers should have been led directly to the suspect. But we reject as clearly erroneous the District Court's assumption or implied finding that the officers in fact received this detailed information. It follows that the conclusion of probable cause is unacceptable. See Jackson v. United States, *supra*, 118 U.S.App.D.C. at 342, 336 F.2d at 580.

I

■ A distinction seems to exist in reviewing judge-made findings in criminal cases between cases where the judge sits in the place of the jury, with the appellate court reviewing his finding of guilt, and where the judge sits and decides matters which traditionally or by statute have been allocated to him. In the former situations, this court applies the same rule it applies in reviewing criminal jury cases: The conviction must be reversed if it is clear "that upon the evidence a reasonable mind could not find guilt beyond a reasonable doubt." [1]

■■ When dealing with findings of a judge on issues other than guilt, however, the test for review, as indicated by the Supreme Court, varies. In cases where the lower court acts concerning matters peculiarly within its discretion, a narrow test is applied.[2] But fact findings unrelated to the exercise of trial court discretion are subjected to a broader test. While the Federal Rules of Criminal Procedure establish no particular test for review, Rule 57(b), FED.R. CRIM.P., authorizes courts, "if no procedure is specifically prescribed by rule, * * * [to] proceed in any lawful manner not inconsistent with these rules or with any applicable statute." Thus, in reviewing facts in such cases, courts apply the "clearly erroneous" standard of

---

1. Cooper v. United States, 94 U.S.App.D.C. 343, 345, 218 F.2d 39, 41 (1954); Farrar v. United States, 107 U.S.App.D.C. 204, 275 F.2d 868 (1959). Other courts look only for "substantial evidence of each of the elements of the crime charged." *E.g.*, United States v. Tutino, 2 Cir., 269 F.2d 488, 489 (1959). But see Maxwell v. United States, 6 Cir., 277 F.2d 481 (1960), applying the "clearly erroneous" test in reversing a judgment of conviction.

2. Thus the scope of review of fact findings underlying denial of a motion for new trial is extremely limited. "While the appellate court might intervene when the findings of fact are wholly unsupported by evidence, * * * it should never do so where it does not clearly appear that the findings are not supported by any evidence." United States v. Johnson, 327 U.S. 106, 111–112, 66 S.Ct. 464, 466, 90 L.Ed. 562 (1946).

Rule 52(a), FED.R.CIV.P.[3] For example, the Supreme Court, in Campbell v. United States, 373 U.S. 487, 493, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963), applied the "clearly erroneous" standard in reviewing a finding of a trial court, pursuant to a motion under the Jencks Act, 18 U.S.C. § 3500(e) (1), that a certain report was actually a copy of the notes of an interview and therefore was a "statement" under the Act. See also Davis v. United States, 328 U.S. 582, 593, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946). Other courts have applied the same test in criminal proceedings.[4] We apply it here.

■ "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."[5] It is clear now that the rule applies whether or not there were conflicts in testimony which the lower court resolved. See generally 2B BARRON & HOLTZOFF, FEDERAL PRACTICE AND PROCEDURE § 1132 (Wright ed. 1961). The test simply becomes narrower when credibility is involved, a result consistent with the language of Rule 52(a), FED.R. CIV.P. So, while courts applying the rule have rejected findings based upon credibility in both civil, e. g., Riddell v. Guggenheim, 9 Cir., 281 F.2d 836 (1960), and criminal cases, e. g., Maxwell v. United States, supra Note 1, this power should be exercised with great caution. See Marsh v. United States, 2 Cir., 29 F.2d 172, cert. denied, 279 U.S. 849, 49 S.Ct. 346, 73 L.Ed. 992 (1928) (L. Hand, J.). The one thing that seems certain in this area is that the "truth" is elusive. To a large extent, therefore, we must rely upon the trial court's judgment based upon its observation of the witnesses. See generally FRANK, COURTS ON TRIAL (1949).

II

■ It remains our responsibility, however, to review fact findings and to reject them when we are firmly convinced they are wrong, when the probability of error is too great to tolerate. This involves, in some contexts at least, an evalu-

---

3. Rule 52(a) provides: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

4. See Murray v. United States, 10 Cir., 333 F.2d 409, 412 (1964), vacated on other grounds, 380 U.S. 527, 85 S.Ct. 1345, 14 L.Ed.2d 266 (1965); United States v. Page, 9 Cir., 302 F.2d 81, 85 (1962) (en banc); United States v. Lawrenson, 4 Cir., 298 F.2d 880, cert. denied, 370 U.S. 947, 82 S.Ct. 1594, 8 L.Ed.2d 812 (1962) (allegation that prosecutor improperly withheld information).

The "clearly erroneous" test is also followed on appeals in habeas corpus proceedings. E.g., Carroll v. Boles, 4 Cir., 347 F.2d 96, 98 (1965). Of course, habeas corpus is considered a civil proceeding, so it is normal that the Rules of Civil Procedure should apply. But the use of the clearly erroneous standard in habeas corpus is significant in that those proceedings generally deal with federal rights, including the question of illegal search and seizure. See also the many cases applying this test in appeals from proceedings under 28 U.S.C. § 2255. E.g., Nichols v. United States, 5 Cir., 325 F.2d 716 (1963), cert. denied, 377 U.S. 970, 84 S.Ct. 1651, 12 L.Ed.2d 739 (1964); Johnston v. United States,, 10 Cir., 292 F.2d 51, cert. denied, 368 U.S. 906, 82 S.Ct. 186, 7 L.Ed.2d 100 (1961); Bayken v. United States, 6 Cir., 272 F.2d 186 (1959); Hearn v. United States, 7 Cir., 194 F.2d 647, cert. denied, 343 U.S. 968, 72 S.Ct. 1064, 96 L.Ed. 1364 (1952).

5. This classic formulation of the test, enunciated in United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), has often been supplemented by other definitions. See, e.g., Nee v. Linwood Securities Co., 8 Cir., 174 F.2d 434, 437 (1949); Sanders v. Leech, 5 Cir., 158 F.2d 486, 487 (1946). As Judge Learned Hand has said, however,

"* * * It is idle to try to define the meaning of the phrase, 'clearly erroneous'; all that can be profitably said is that an appellate court, though it will hesitate less to reverse the finding of a judge than that of an administrative tribunal or of a jury, will nevertheless reverse it most reluctantly and only when well persuaded. * * *" United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 433 (1945).

ation of the credibility of the witness or witnesses upon whose testimony the finding is based. While the trial judge's observation of demeanor must be given appropriate weight, it must be remembered that "[c]redibility involves more than demeanor. It apprehends the overall evaluation of testimony in light of its rationality or internal consistency and the manner in which it hangs together with other evidence." Carbo v. United States, 9 Cir., 314 F.2d 718, 749 (1963), cert. denied, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964). Thus, to the extent that the credibility of the police officers in this case turns on their demeanor, we must defer. But that the officers seemed to be telling the truth does not end the matter. A number of other factors often considered in judging credibility must be examined, such as whether the witness was interested in the outcome, his reputation, his degree of recall, the internal inconsistencies in his testimony, and the likelihood of his story.[6]

A close scrutiny of the record in this case is required because of circumstances which seriously hampered the opportunity of the judge at the hearing on mandate fully to evaluate credibility. The testimony in this case is spread out in three transcripts which were compiled over a nearly two-year period.[7] The serious in-consistencies in the officers' testimony become clear only by studying the first transcript and comparing it with the second and third. Significantly, the judge who presided at the trial and at the hearing on mandate did not preside at the first hearing; nor is there adequate proof that he familiarized himself with or considered the transcript of the first hearing.[8] Apparently the trial judge did not consider the possibility that Bello's testimony should be rejected. Had he done so specifically, he probably would have dealt with some of the matters we discuss below. As it is, we cannot assume that he gave Bello's credibility the attention it deserved.

■■■ Normally, as an appellate court, we accept the testimony of police officers and other witnesses credited by the trial court. But we are not compelled to accept the testimony of any witness. See, e. g., Kelly v. United States, 90 U.S. App.D.C. 125, 194 F.2d 150 (1952); Herter v. United States, 9 Cir., 27 F.2d 521 (1928), both rejecting police testimony. Officer Bello's testimony was corroborated by Ralls, his fellow officer,[9] but, as the Supreme Court has stated, the doctrine that if witnesses concur in proof of a material fact they ought to be believed "can be received only under many qualifications, and with great caution." The Santissima Trinidad, 20 U.S. (7

---

6. See generally Willett v. Fister, 85 U.S. (18 Wall.) 91, 21 L.Ed. 804 (1873); 3 WIGMORE EVIDENCE § 993 (3d ed. 1940); Brochin & Sandler, *Appellate Review of Facts in New Jersey, Jury and Non-Jury Cases*, 12 RUTGERS L.REV. 482, 484–490 (1958).

7. The evidence in this case is drawn from three transcripts: (1) the original hearing on appellant's motion to suppress, held before Judge Hart on February 1, 1963 [hereinafter cited "1 Tr."]; (2) the trial, held before Judge McGarraghy on September 16, 1963 [hereinafter cited "2 Tr."]; and (3) the hearing on mandate, held before Judge McGarraghy on December 4 and 21, 1964 [hereinafter cited "3 Tr."].

8. When the defendant at trial attempted to make the point that the policemen had given at the first hearing a materially dif-ferent explanation for arresting the other man, the court treated the matter as insignificant—"It doesn't make any difference what he said"—and strongly indicated that he would have denied defendant's request for a transcript if it had been pressed on that ground alone:

"THE DEFENDANT: Can you give me a transcript of the pretrial motion?

THE COURT: Is that all you want to ask him?

THE DEFENDANT: May I have a transcript?

THE COURT: Is that all you want to ask him?" [2 Tr. 53.]

9. Officer Ralls did not testify at either the original hearing on the motion to suppress or the hearing on mandate. At the hearing on mandate the Government expressed its intention "to rely only on Officer Bello * * *." [3 Tr. 17.]

Wheat.) 283, 338, 5 L.Ed. 454 (1822) (Story, J.). In some cases police testimony, like other testimony, will simply be too weak and too incredible, under the circumstances, to accept.

Officer Bello's ability to recall dates and events was unimpressive. [See, *e. g.*, 3 Tr. 29, 39.] The only thing he claimed to remember in detail was the description of Jackson. Furthermore, there are important inconsistencies in his testimony. For example, Bello testified at the first hearing that the officers arrested the man who was in the delicatessen with Jackson because "[w]e wanted to be sure of our identification. They resembled each other." [1 Tr. 19.] At the trial he claimed the arrest was made because the officers did not "want to make it too obvious that we had information that he had the narcotics on him" [2 Tr. 39], and at the hearing on mandate he said the description tallied as soon as he saw Jackson [3 Tr. 25–26]. This and other inconsistencies contribute to our conviction that the credibility of Bello's testimony was questionable at best.[10]

Our conviction that Bello's testimony should have been discredited, however, is primarily based on the fact that it contains internal contradictions and is contrary to human experience. The doctrine that appellate courts must reverse findings based upon "inherently incredible" testimony has long been accepted in this jurisdiction.[11] Sometimes, it is possible to disprove testimony as a matter of logic by the uncontradicted facts or by scientific evidence. *E. g.*, The Telephone Cases (Dolbear v. American Bell Tel. Co.), 126 U.S. 1, 567, 8 S.Ct. 778, 31 L.Ed. 863 (1888). But the doctrine of inherent incredibility does not require such positive proof. It is enough to invoke the doctrine if the person whose testimony is under scrutiny made allegations which seem highly questionable in the light of common experience and knowledge,[12] or behaved in a manner strongly at variance with the way in which we would normally expect a similarly situated person to behave.[13]

10. At the trial and at the hearing on mandate, Bello testified that Gaskins told him she was turning in Jackson because she would not share his narcotics with her [2 Tr. 54; 3 Tr. 56], but at the original hearing, when asked whether she had told him that she and Jackson "had an argument on that day and she was turning him in for revenge," Bello answered, "No, sir, she didn't." [1 Tr. 18.] It is at least incongruous, too, that Bello would ask Gaskins, as he testified he did, whether she was familiar with narcotics [1 Tr. 16], when he admitted questioning her in a manner which indicated he assumed her familiarity with narcotics [2 Tr. 80].

11. "In weighing testimony, we are not bound to believe a particular fact, testified to by one or more witnesses * * *. The inherent probability or improbability of such a fact is to be tested by the unquestioned circumstances that surround the main transaction or occurrence [*i.e.*, by the undisputed testimony], as well as by 'the ordinary laws that govern human conduct.'" Beals v. Finkenbiner, 12 App. D.C. 23, 29 (1897).

This court in effect used the inherently incredible doctrine relatively recently in reversing a criminal conviction rendered by a judge: "It is nearly or quite incredible that appellant could have used a knife as extensively as the girl said he did without her ever seeing it." Farrar v. United States, *supra* Note 1, 107 U.S.App.D.C. at 205, 275 F.2d at 869.

12. A prominent example of this type of case is Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935), where the Court found systematic exclusion of Negroes from juries, despite the testimony of officials, which the trial court accepted, that they had not consciously discriminated against Negroes. The testimony was insufficient in light of the strong case made for discrimination by the complete absence of any Negroes on juries for a long period, and other facts. One jury commissioner testified that he did not know a single Negro who qualified to vote under the state constitution. The Court refused to believe him because of the evidence in the case which proved the actual existence of many qualified Negroes. *Id.* at 599, 55 S.Ct. 579. See State v. Petrolia, 21 N.J. 453, 122 A.2d 639 (1956).

13. *E.g.*, Atlantic Works v. Brady, 107 U.S. (17 Otto) 192, 203 (1882); Willett v. Fister, *supra* Note 6; Alexander v. Blackman, 26 App.D.C. 541 (1906).

These elements are present in this case. It is difficult to believe that a prostitute, probably an addict as well, in a Negro slum would walk up to an officer and recite so detailed a description of the suspect.[14] Gaskins flatly denied giving the information. Moreover, the uncontradicted testimony indicates that the officers did not behave as we would expect officers with such a detailed description of the suspect to behave. They arrested both Jackson and the other man in the delicatessen, and searched the other man first; and their behavior was inadequately explained, since Bello gave completely inconsistent reasons for arresting the other man. This indeed was a course of conduct pursued by persons with special training and knowledge who "cannot be presumed liable to mistake," The Santissima Trinidad, *supra*, 20 U.S. (7 Wheat.) at 339, which was "utterly at variance with" their testimony, Atlantic Works v. Brady, *supra* Note 13, 107 U.S. (17 Otto) at 203. Even if some consistent explanation were offered, the admission of these officers to one illegal search tends to prove they were involved in mere investigative arrests and thus furnishes strong reason to reject their testimony. We have "the definite and firm conviction" that if the officers had the detailed description of the suspect they claimed to have, they would have arrested but one man. Their action, in the circumstances of this case, in arresting two men, and searching the wrong one first, makes their testimony as to the description of the suspect allegedly received from the informant inherently incredible.[15]

In rejecting under the clearly erroneous test the trial court's finding that the officers had the description they claimed, we need not reject any of the trial court's other findings. Thus it is possible that Gaskins had given information in the past, and did tell Bello that there was a Negro man in Franklin's Delicatessen who had heroin in his possession. We reject only the implied finding that the officers received the detailed description they claimed. And in doing this it should be emphasized that we are not necessarily finding the officers' testimony untrue. Our task is a technical one. It has nothing to do with truth in the abstract. The officers' testimony "may be true; but we cannot give it effect against what [they themselves] did, and did not do, without disregarding the ordinary laws that govern human conduct." Atlantic Works v. Brady, *supra* Note 13, 107 U.S. (17 Otto) at 203.

14. There are so many details, even the testimony of the officers varied. Bello testified that Gaskins said Jackson was 25 to 27 years old, 5′ 9″, and wore "a brown cap, a tan zipper waist-length jacket, green corduroy trousers." Ralls left out parts of Bello's description and added a few details of his own, including that Gaskins said Jackson weighed about 159 pounds, was 5′ 11½″ tall, had a "medium build," and wore a brown *beret* cap. [2 Tr. 84.]

15. Of course, if an officer obtained a warrant before making a legal along with an illegal arrest, the detailed information he allegedly received would have been presented to a neutral judicial body and recorded in an affidavit. We might then be compelled to accept the argument that he acted lawfully as to one person and unlawfully as to the other. But where he has not obtained a warrant, has not secured judicial confirmation of his possession of the description and thereby obviated the necessity of any speculation as to the true facts, this failure on his part should operate against acceptance of ·his testimony. The Supreme Court has stated that the warrantless arrest will be more closely scrutinized than one based ·upon a warrant. United States v. Ventresca, 380 U.S. 102, 106, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); see Wong Sun v. United States, 371 U.S. 471, 479, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). One reason for this may well be the possibility that officers will fabricate evidence after the arrest to justify their acts, and the difficulty of proving such fabrication. It is true that we do not guard against after-the-fact fabrication in all cases by requiring that a warrant be obtained whenever practicable. But this does not preclude us from attaching significance to the failure to obtain a warrant in appropriate cases. If anything, our decision not to impose a blanket rule requires us to scrutinize more closely the testimony in cases involving warrantless arrests.

In any new trial, if the defense of insanity is raised, the court must assure that its presentation is more adequate on behalf of this indigent defendant than its presentation at the trial appealed here. See Jackson v. United States, *supra,* 118 U.S.App.D.C. at 343, 336 F.2d at 581 (concurring opinion).

Reversed.

McGOWAN, Circuit Judge (dissenting):

With all respect for the views of the majority as to the disposition to be made of this admittedly close case, my own feeling is that reversal is not required. Upon the facts as the trial judge took them to be, the question is solely one of the reasonableness of the police officer's decision to act on the basis of what the informant had told him. Under the circumstances, that action, if it was to be effective, apparently had to be immediate. I cannot say that, viewing the matter from one situated as was the officer, the decision to act promptly to apprehend appellant was unreasonable. The informant was personally known to the officer as one who had given him reliable leads in the past. That those happened to be in other areas of criminality than narcotics does not seem to me to be controlling. Those very areas suggest that

she was living in that unfortunate world where narcotics make their appearance, and where an asserted failure to share them with an associate provides a vengeful and sordid, but highly credible, motivation to inform the police. Assuming that the motivation in question was signified by the informant under the circumstances related by the police, this record has for me a flavor of credibility; or, at the least, I cannot say that it may not reasonably have seemed so to the officer on the beat.

The majority opinion expressly grounds its reversal, however, in its refusal to accept the facts as they appeared to the trial judge. Applying the "clearly erroneous" standard of Rule 52(a), FED.R.CIV.P., it nonetheless rejects the hearing judge's "assumption or implied finding of fact" that the police officers received *any* detailed description of appellant from the alleged informant.[1] There being a direct conflict in the testimony on this point between the informant, on the one hand, and the two police officers, on the other, this reversal may be said to come about because the trial judge chose to believe the latter. From the remoter vantage point I occupy—a remoteness in contemplation of which Rule 52(a) was consciously framed—I cannot say that this choice was "clearly erroneous."

---

1. The alleged informant, Gaskins, testified flatly that she never talked to Officers Bello and Ralls at all. The majority accepts the trial court's finding to the contrary, and states that "it is possible that Gaskins had given information in the past, and did tell Bello that there was a Negro man in Franklin's Delicatessen who had heroin in his possession." It rejects "only the implied finding that the officers received the detailed description they claimed." It founds this rejection upon the belief that, had the detailed description in fact been given, the officers would never have taken two men from the store into the street and searched the appellant second. This does not seem to me so improbable as it does to my brethren, however illegal it may have been in respect of the second man. The officers said that they were approached abruptly by Gaskins and told that one man, possessing heroin and dressed in a certain way, was

in a neighboring store. When they entered the store they found two men together. Even though the description fitted only one, it strikes me as not unlikely that, having found two in company when they expected only one, they requested the two to come outside, with a purpose to search both. One does not have to condone this in respect of the second man in order to think that a finding of probable cause could rationally be made as to the arrest and search of appellant. The varying explanations given by Bello of why the second man was seized may reflect his consciousness of vulnerability to criticism in respect of that arrest, but they do not seriously undermine his position *vis-a-vis* Gaskins as to who was telling the truth about their talk, or explain away the fact that the officers were able to go directly to appellant even though they unforewarnedly found him in the company of another man.